(C.D. 3040)

M. H. GARVEY COMPANY v. UNITED STATES

## United States Customs Court, First Division

(Decided June 22, 1967)

*Walter E. Doherty, Jr.,* for the plaintiff.

*Carl Eardley,* Acting Assistant Attorney General (*Arthur H. Steinberg* and *Dominick M. Minerva,* trial attorneys), for the defendant.

Before OLIVER, WATSON, and BECKWORTH, Judges

BECKWORTH, Judge: The merchandise involved in this case consists of rubber marking devices, referred to as decals or decalcomanias. It was imported from Italy and entered at the port of Boston on January 24, 1962, and was assessed with duty at 12½ per centum ad valorem under paragraph 1537(b) of the Tariff Act of 1930, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by 90 Treas. Dec. 280, T.D. 53877, as manufactures in chief value of rubber. It is claimed to be properly dutiable at 20 cents per pound under paragraph 1406 of said tariff act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, as decalcomanias, not backed with metal leaf.

The pertinent provisions of the said tariff act, as modified, are:

Paragraph 1537(b), as modified by T.D. 53865 and T.D. 53877:

Manufactures of india rubber or gutta-percha, or of which these substances or either of them is the component material of chief value, not specially provided for (except * * *):

| * | * | * | * | * | * | * |

Other_____12½% ad val.

Paragraph 1406, as modified by T.D. 51802:

Pictures, calendars, cards, placards, and other articles (not including labels, flaps, and cigar bands), composed wholly or in chief value of paper lithographically printed in whole or in part from stone, gelatin, metal, or other material (except * * *), not specially provided for:

| * | * | * | * | * | * | * |

Decalcomanias (except toy decalcomanias and decalcomanias in ceramic colors):

If not backed with metal leaf_____ 20¢ per lb.

The record in this case consists of a number of samples and exhibits and the testimony of two witnesses called by the plaintiff and one witness called by the defendant: David L. Marx, sales manager of Pottersign Company, decal manufacturers; Robert A. Lord, manager of hose research and development of Boston Woven Hose & Rubber

Company, division of American Biltrite Rubber Company, and Robert W. Burke, sales representative of The Meyercord Company, manufacturer of decalcomanias. (The terms "decal" and "decalcomania" have been used interchangeably in the record.)

Collective exhibit 1 consists of samples representative of the imported merchandise. They are short strips of very thin rubber material containing printing or marking thereon, covered by aluminum foil backed with paper, in chief value of rubber. The only uses shown by the testimony were on rubber hose or V-belts manufactured by Boston Woven Hose & Rubber Company. Mr. Lord first examined such merchandise in 1957 or 1958. He testified that these marking devices are placed by hand upon unvulcanized hose with the rubberized surface next to the hose and the aluminum foil portion on top. This is done just before the hose goes into the "lead pressing operation" which involves feeding the hose into a lead pipe. Subsequently, the hose is put into a vulcanizer and cured, and the lead stripped from the hose. During vulcanization the marking device becomes an integral part of the hose through a combination of heat and pressure. The aluminum foil-paper portion falls off or is pulled off during the stripping operation. The witness stated that the aluminum foil protects the printed surface from becoming lead stained and also makes the device rigid enough to be handled.

Exhibit 2 is a water-type decal made of a simplex type of paper with a dextrine (gum or starch) coating, printed by silk screen process. It is used by dipping in water, placing in position on an object, removing the backing paper, and smoothing out the marking portion. It can be applied face up or face down. Mr. Marx testified that merchandise of this type has been on the market for close to a century. He and Mr. Burke agreed that this was a decalcomania within the strict definition of that term.

Various other marking devices made of different materials were received in evidence as illustrative exhibits or were referred to in catalogs or military specifications. In the view we take of the case, it is not necessary to discuss them.

Plaintiff claims that the imported merchandise falls within the provision in paragraph 1406, as modified, *supra*, for decalcomanias, under the well-known principles that an *eo nomine* designation without words of limitation will include all forms of the article, and that tariff acts are made for the future as well as the present and are intended to embrace new articles not in existence at the time of the passage of the tariff act. *Nootka Packing Co.* v. *United States*, 22 CCPA 464, T.D. 47464; *United States* v. *Williams Clarke Co., a/c American Agar and Chemical Co.*, 50 CCPA 67, C.A.D. 822; *Hoyt, Shepston & Sciaroni, S. Blondheim & Co.* v. *United States*, 52 CCPA

101, C.A.D. 865; *R. J. Saunders & Co., Inc.* v. *United States*, 49 CCPA 87, C.A.D. 801; *Davies Turner & Co.* v. *United States*, 45 CCPA 39, C.A.D. 669.

After referring to these principles, the court in *Davies Turner & Co.* v. *United States, supra,* stated:

> While it might appear superficially that those principles could, on occasion, be conflicting, a careful study of the decisions does not support such a view. The meaning of *eo nomine* provisions is to be determined as of the date of enactment but, when so determined, that meaning will embrace all subsequently created articles which fall within it. Tariff acts, therefore, are made for the future in the sense that they embrace articles not in existence at the time of enactment, but the meaning of words used in such acts is fixed at the time of enactment and does not fluctuate as the meaning of words might subsequently vary.

That distinction was clearly set forth in the *Smillie* case as follows:

> The rule [that the meaning of an *eo nomine* provision of a tariff act is that which it has at the time of enactment] of course, does not operate to exclude articles which are not known at the time of the passage of the act, but which come into being later. *As to all such articles the statute will be held to apply if the article possesses an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification.* [Italics quoted.]

In *R. J. Saunders Co.* v. *United States, supra,* the question was whether electric dry shavers, not known in 1930, were classifiable as safety razors. The court first considered the meaning of the *eo nomine* designation "safety razors" as of the effective date of the 1930 act and then considered whether that meaning fairly and clearly included electric dry shavers. It found that in operation, structure, and appearance the imported electric dry shavers were vastly different from the safety razors known in 1930 and were not fairly and clearly included in that term.

In *Hoyt, Shepston & Sciaroni* v. *United States, supra,* the merchandise consisted of sausage casings made of hog bung with a viscon or synthetic lining. Such casings were not known in 1930 and the question was whether they were classifiable as sausage casings under the Tariff Act of 1930. The court held they were not, stating:

> It is considered conclusive from the foregoing that being an animal organ or part, as are weasands, intestines, bladders, tendons and integuments, is an essential requirement for sausage casings to fall within paragraph 1755 and be duty free. Since the importations here include linings of artificial material, they constitute more than natural sausage casings falling under paragraph 1755 and do not resemble such natural sausage casings as to the criteria for their classification. * * *

In the instant case, it appears that the imported rubber marking devices were not known in 1930. Plaintiff claims that they fall within paragraph 1406, as modified, as decalcomanias, on the ground that they are used in the same way as the water transfer type decalcomanias, which were then known, were used and that they are devices for transferring pictures, designs, or lettering to a permanent surface.

The term "decalcomania" has been defined as follows:

Art or process of transferring pictures and designs, as from specially prepared paper, to china, glass, marble, etc., and permanently affixing them thereto; also, a picture or design prepared to be so transferred. [Webster's New International Dictionary, 1930 edition.]

1. The art or process of transferring pictures and designs typically from specially prepared paper to china, glass, or marble and permanently fixing them thereto;
2. a: a picture or design prepared for transfer by decalcomania b: a paper on which designs are printed for transfer printing. [Webster's New International Dictionary, 1966 edition.]

A process of transferring prints from paper and making them adhere to glass, porcelain, or the like; also, such a print when ready to be transferred. [Funk & Wagnalls New Standard Dictionary, 1938 edition, 1952 edition.]

1. A process of transferring decorative pictures or designs from paper to glass, porcelain, etc. 2. Such a print to be transferred. [Britannica World Language Dictionary, 1963 edition.]

While it is clear from the record that the imported merchandise consists of marking devices intended to be affixed to other articles, they do not fall within the meaning of the term "decalcomania," as commonly understood. Both the earlier and later definitions quoted above define "decalcomania" as a print or design on specially prepared paper which is to be transferred to glass, porcelain, or other material. Here, the print or design is not on paper, but on rubber.

There is evidence in the record that the meaning of the term "decalcomania" as used in the trade has broadened in the last 10 years. However, no commercial designation has been claimed and the proof is insufficient to meet the requirements that the term as used in commerce have a meaning other than the common meaning, which is general, definite, and uniform throughout the country. *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422; *United States* v. *Pacific Overseas Co. et al.*, 42 CCPA 1, C.A.D. 559. Only two witnesses testified as to a trade meaning in this case and one of them indicated that those who had been in the business only for the last few years might give the term a broader and different meaning than those who had been long in the trade.

Moreover, the provision for decalcomanias in paragraph 1406, *supra*, is not without limitation, as plaintiff contends. As originally enacted and as modified by the General Agreement on Tariffs and Trade, paragraph 1406 is limited to articles composed wholly or in chief value of paper lithographically printed in whole or in part. Decalcomanias comprise one of the classes of articles described thereunder. The Summary of Tariff Information, 1929, which was before Congress when the Tariff Act of 1930 was being drafted, states (p. 1838) :

Decalcomanias are transfer pictures, designs, or other decorations. They are printed either on simplex paper (par. 1305) or duplex paper (par. 1635), for transfer to pottery, glassware, machinery, furniture, advertising novelties, etc. Ceramic prints are composed of metallic colors which fuse with the pottery to which transferred when fired.

A later summary, Tariff Information Summaries of 1948, provides (vol. 14, p. 111) :

Decalcomanias are pictures, designs, or lettering, in single multiple colors, lithographed on paper coated with starch and gum from which the imprint may be transferred to a permanent surface.* * *

See also the discussion in *F. M. Kaysing* v. *United States*, 56 Cust. Ct. 544, C.D. 2698.

In the instant case, the witness, Burke, testified that exhibit 2 conformed to the definition quoted above from the 1929 and 1948 Summaries of Tariff Information, but that exhibit 1 did not, because it was not printed on simplex or duplex paper, and the paper was not coated with gum or starch.

It is quite evident from these authorities that, insofar as the term "decalcomanias" is used in paragraph 1406, *supra*, it means an article *in chief value of paper* consisting of pictures, designs, or lettering on certain kinds of *paper* intended to be transferred to another surface. The marking devices now before us are printed on rubber and are in chief value of rubber. Therefore, they do not meet the particulars established by the statute as criteria, and may not be classified thereunder, whether or not they are considered decalcomanias by the trade and are used for the same purposes as the paper type transfer markings. Paragraph 1406 does not cover all marking devices but only those which are "articles, composed wholly or in chief value of paper lithographically printed in whole or in part * * * decalcomanias in ceramic colors, * * *; all other decalcomanias, except toy decalcomanias * * *." This language effectively eliminates the merchandise involved herein.

For the reasons stated, the protest is overruled and judgment will be entered for the defendant.