(C.D. 4119)

M. H. GARVEY COMPANY v. UNITED STATES

United States Customs Court, First Division

(Decided November 5, 1970)

*Walter E. Doherty, Jr.*, for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Owen J. Rader* and *Velta A. Melnbrencis*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The legal question presented in these eighteen cases, consolidated for purposes of trial, pertains to the proper classification, for customs duty purposes, of certain merchandise claimed by the plaintiff to be decalcomanias.

The merchandise was imported from Italy from January 1964 through September 1966. It was classified by the customs officials under item 774.25 of the Tariff Schedules of the United States, as "[a]rticles not specially provided for, of rubber or plastics: * * * [o]f natural rubber", and was therefore assessed with duty at the rate of 12.5 per centum ad valorem. By timely protests duly filed, plaintiff claims that the merchandise should have been classified under item 273.75 of the tariff schedules, as "[d]ecalcomanias (except toy decalcomanias): * * * [o]ther: [n]ot backed with metal leaf", with duty at the rate of 20 cents per pound.

At the trial, the official papers were introduced into evidence, and, upon plaintiff's motion, there was incorporated into the record of this case, the record in the case of *M. H. Garvey Company* v. *United States*, 58 Cust. Ct. 530, C.D. 3040 (1967). Since the testimony given at that trial was summarized in the decision of the court, it will not be restated here.

Subsequent to the trial of this case, the parties stipulated that the merchandise at bar is the same in all material respects as the merchandise in the incorporated case. Specifically, it was agreed that plaintiff's exhibit "A", a representative sample of the imported merchandise, was the same in all material respects as plaintiff's exhibit 1 in the incorporated case, consisting of representative samples of the imported merchandise in the incorporated case.

The statutes, pertinent to the case at bar, may conveniently be set forth as follows:

Claimed under:

> "Decalcomanias (except toy decalcomanias) :
> \*       \*       \*       \*       \*       \*       \*
> Other:
> 273.75       Not backed by metal leaf_____       20¢ per lb."

Classified under:

> "Articles not specially provided for, of rubber or plastics:
> \*       \*       \*       \*       \*       \*       \*
> 774.25       Of natural rubber_____:_____       12.5% ad val."

Schedule 2, Part 5, Headnote 1:

> "Except for decalcomanias, labels, flaps, and bands, all of which are covered by the provisions therefor in this part, regardless of the nature of the printing thereon, this part covers only printed matter consisting essentially of textual or pictorial matter produced by any printing process, and similar matter in manuscript or typewritten form. The text may be set forth in any language by means of any kind of characters. With the exceptions above indicated, this part does not cover any article in which printing is merely incidental to the primary use of the article or in which printing is employed mainly for coloration or to produce a decorative or novelty effect (see part 4 of this schedule)."

The court, in the incorporated case, described the representative samples of the articles in question as follows:

> "They are short strips of very thin rubber material containing printing or marking thereon, covered by aluminum foil backed with paper, in chief value of rubber. The only uses shown by the testimony were on rubber hose or V-belts manufactured by Boston Woven Hose & Rubber Company. Mr. Lord first examined such merchandise in 1957 or 1958. He testified that these marking devices are placed by hand upon unvulcanized hose with the rub-

berized surface next to the hose and the aluminum foil portion on top. This is done just before the hose goes into the 'lead pressing operation' which involves feeding the hose into a lead pipe. Subsequently, the hose is put into a vulcanizer and cured, and the lead stripped from the hose. During vulcanization the marking device becomes an integral part of the hose through a combination of heat and pressure. The aluminum foil-paper portion falls off or is pulled off during the stripping operation. The witness stated that the aluminum foil protects the printed surface from becoming lead stained and also makes the device rigid enough to be handled." 58 Cust. Ct. at 532.

These articles are to be compared with the samples of water transfer decalcomanias consisting of exhibit 2 in the incorporated case, which were introduced to show the nature of the original type of decalcomanias which have been produced since the Civil War. In the incorporated case, the article represented by exhibit 2 was described as "a water-type decal made of a simplex type of paper with a dextrine (gum or starch) coating, printed by silk screen process. It is used by dipping in water, placing in position on an object, removing the backing paper, and smoothing out the marking portion. It can be applied face up or face down." It was agreed that this article was a decalcomania within the strict meaning of that term.

The defendant urges an affirmance of the classification made by the customs officials, and in effect, relies upon the decision of the incorporated case. In its brief the defendant states:

"Inasmuch as the instant merchandise is the same in all material respects as that in the *Garvey* case, *supra*, and plaintiff has failed to produce any additional testimony whatsoever to show that the common meaning of the term 'decalcomania' should include the instant merchandise, this Court's former holding as to the meaning and scope of that term, based on a correct interpretation of the various definitions and the testimony, should be binding and applicable to this case." (Defendant's brief, pp. 7–8)

Plaintiff argues that the *Garvey* case, upon which the defendant relies, was decided in favor of the defendant on the ground that paragraph 1406 of the Tariff Act of 1930, as amended and modified, under which plaintiff claimed that the merchandise was classifiable, was limited in its application to articles in chief value of paper. Since the articles were in chief value of rubber, the court therein held that they had been properly classified under paragraph 1537 (b) of the Tariff Act of 1930 as articles in chief value of rubber.

In the case at bar, plaintiff maintains that these same articles, at the dates when imported, under the Tariff Schedules of the United States, are properly dutiable under item 273.75 as "[d]ecalcomanias (except toy decalcomanias) : * * * [o]ther:  [n]ot backed by metal

leaf", at the rate of 20 cents per pound. In support of that contention plaintiff asserts that, unlike paragraph 1406 of the Tariff Act of 1930, item 273.75 of the tariff schedules is not limited to articles in chief value of paper. Plaintiff points out that whereas paragraph 1406 of the Tariff Act of 1930 provided for "[p]ictures * * * and other articles * * * composed wholly or in chief value of paper * * *", there is no such limiting language in item 273.75 of the tariff schedules or in part 5 of schedule 2 of the schedules which contains item 273.75.

Apart from its additional reliance upon the *Nomenclature for the Classification of Goods in Customs Tariffs*, commonly referred to as the *Brussels Nomenclature*, plaintiff seeks to establish a change in legislative policy since the enactment of the Tariff Act of 1930. In addition to its reference to headnote 1, part 5 of schedule 2, previously quoted, plaintiff sets forth the following quotations:

Tariff Classification Study, Schedule 2 (1960):

> "As set forth in headnote 1, part 5 covers only printed matter consisting essentially of textual or pictorial matter, except for decalcomanias, labels, flaps and bands which are included in this part regardless of the nature of the printing thereon. The existing provisions for such printed matter are unorganized, overlapping, and widely scattered throughout schedules 14 and 16 of the Tariff Act of 1930." Explanatory Notes at 136.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> "Items 273.65 through 273.80 would continue without rate change the present provisions for decalcomanias in paragraph 1410 [1406]. Decalcomanias are imprinted on paper, usually in colored pigments, which may be transferred from the paper to a permanent surface. Ceramic decalcomanias are for use in transferring designs to pottery and other ceramic ware and are usually printed on a duplex type of paper. The different rates according to weight are to compensate for difference in weight arising when the article may be imported either as print on the duplex paper or with the heavy backing sheet removed from the thin sheet actually bearing the imprint. Other decalcomanias are used for many purposes where application of designs or printed matter to surfaces is involved, including lettering, trademark, machine instructions, and decorations." Explanatory Notes at 140.

Defendant, in response, initially asserts that since the common meaning of the term "decalcomania" is free from ambiguity, the tariff schedule item is clear and "resort to legislative history is superfluous." See *F. L. Smidth & Company* v. *United States*, 56 CCPA 77, C.A.D. 958, 409 F.2d 1369 (1969); *W. R. Filbin & Co., Inc.* v. *United States*, 63 Cust. Ct. 200, C.D. 3897, 306 F. Supp. 440 (1969). Although the court does not agree that the question is as free from doubt as

asserted, the court does agree with the defendant that "[i]nasmuch as, according to the common meaning of the term 'decalcomania,' the latter must be of paper, there was no need to specify in item 273.75 that the word covers only paper decalcomanias." Defendant also asserts that "in order to cover other than paper decalcomanias, the statutory language of item 273.75 would have had to contain additional descriptive language or a headnote provision making it clear that the framers had adopted a special and not the common meaning of the word." (Defendant's brief, p. 10)

It is basic in customs jurisprudence that tariff laws are written in the language of commerce. Also, in the absence of satisfactory proof that there is a contrary commercial designation, which is uniform, definite, and general throughout the trade and commerce of the United States, it is presumed that the commercial meaning of tariff terms is the same as their common meaning. *Moscahlades Bros., Inc.* v. *United States*, 42 CCPA 78, 82, C.A.D. 575 (1954); *United States* v. *E. Dillingham, Inc.*, 41 CCPA 221, 224, C.A.D. 555 (1954); *Ashear Bros., Inc.* v. *United States*, 55 Cust. Ct. 238, 241, C.D. 2582 (1965). It is equally well established that the common meaning of a tariff term is a question of law to be determined by the court, and that the testimony of witnesses as to common meaning is considered to be only advisory. *American Express Company* v. *United States*, 39 CCPA, 8, 10, C.A.D. 456 (1951); *United States* v. *Florea & Co., Inc.*, 25 CCPA 292, 296, T.D. 49396 (1938).

As in other cases where the common meaning of a tariff term has been in issue, the court has examined a quantity of lexicographic definitions of "decalcomanias". The following, representative of the common meaning of the word, either prior to or at about the time of the enactment of the Tariff Schedules of the United States, are particularly pertinent:

*The Dictionary of Paper* (2nd ed., 1951)

"A process of transferring printed designs to porcelain, wood, glass, marble, etc. It consists usually in gumming the paper or other film bearing the colored picture or object and then removing the paper with warm water, the colored picture remaining."

*Funk & Wagnalls New Standard Dictionary* (1956)

"1. a process of transferring prints from paper and making them adhere to glass, porcelain, or the like; also, such a print when ready to be transferred."

*Webster's Third New International Dictionary* (1963)

"1: the art or process of transferring pictures and designs typically from specially prepared paper to china, glass, or marble and permanently fixing them thereto. 2a: a picture or design

prepared for transfer by decalcomania. b: a paper on which designs are printed for transfer printing."

*Britannica World Language Dictionary* (1936)

"1. A process of transferring decorative pictures or designs from paper to glass, porcelain, etc. 2. Such a print to be transferred."

From these definitions it would seem clear that a decalcomania is an article of paper and is so constructed that during its application only the picture, print, or design, and not the carrier, i.e., the paper, is transferred to the glass, porcelain, wood, marble or other object.

It is interesting to note that, after considering certain lexicographic definitions of the word "decalcomania", the court, in the incorporated case, concluded that:

"While it is clear from the record that the imported merchandise consists of marking devices intended to be affixed to other articles, they do not fall within the meaning of the term 'decalcomania,' as commonly understood. Both the earlier and later definitions [quoted in the incorporated case] define 'decalcomania' as a print or design on specially prepared paper which is to be transferred to glass, porcelain, or other material. Here, the print or design is not on paper, but on rubber." 58 Cust. Ct. at 534.

This finding of the court, as to the nature of a decalcomania, finds support in the case of *F. H. Kaysing* v. *United States*, 56 Cust. Ct. 544, 550, C.D. 2698 (1966), where the court said:

"It would also be left to conjecture only to support a finding that these ovals [claimed to be decalcomanias] were so composed as to be susceptible of having their surface design imparted to another surface by the transfer process hereinabove described in the absence of competent proof * * *."

Since the sole proof in the case at bar is to be found in the incorporated record, there can be no quarrel that plaintiff has not produced any additional testimony to show that the common meaning of the term "decalcomania" would include the controverted merchandise. The sources upon which the court relied for its finding in the prior *M. H. Garvey* case are equally applicable here, and the court regards the determination of the court in that case, as to the common meaning of the term "decalcomania" to be correct and fully supported. Indeed, it may be added that the various definitions of the word have remained constant and manifest no change of meaning.

At the trial of the incorporated case there was testimony that the term "decalcomania" has broadened in the last ten years. One witness gave his view as follows:

"I would say that perhaps the people who have been in the trade many, many years understand a decal to be something which

is printed in a liquid form on a paper carrier, and later transferred. Someone who has been recently in the business would probably not make this distinction * * *."

This evidence was considered in the incorporated case. After noting that "[t]here is evidence in the record that the meaning of the term 'decalcomania' as used in the trade has broadened in the last 10 years", the court stated:

"However, no commercial designation has been claimed and the proof is insufficient to meet the requirements that the term as used in commerce have a meaning other than the common meaning, which is general, definite, and uniform throughout the country." 58 Cust. Ct. at 534.

Citing the cases of *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422 (1949), and *United States* v. *Pacific Overseas Co. et al.*, 42 CCPA 1, C.A.D. 559 (1954), the court commented upon the insufficiency of the evidence as follows:

"Only two witnesses testified as to a trade meaning in this case and one of them indicated that those who had been in the business only for the last few years might give the term a broader and different meaning than those who had been long in the trade." *Ibid.*

The court, in the incorporated case, quoted definitions of decalcomanias from the *Summary of Tariff Information*, 1929, which was before Congress when the Tariff Act of 1930 was being drafted, and from a later summary, the *Summaries of Tariff Information*, 1948. The court noted that a witness, Mr. Burke, testified that exhibit 2 conformed to those definitions "but that exhibit 1 did not, because it was not printed on simplex or duplex paper, and the paper was not coated with gum or starch." 58 Cust. Ct. at 535.

The court consequently overruled the protest for the following reasons and in the following langauge:

"It is quite evident from these authorities that, insofar as the term 'decalcomanias' is used in paragraph 1406, *supra*, it means an article *in chief value of paper* consisting of pictures, designs, or lettering on certain kinds of *paper* intended to be transferred to another surface. The marking devices now before us are printed on rubber and are in chief value of rubber. Therefore, they do not meet the particulars established by the statute as criteria, and may not be classified thereunder, whether or not they are considered decalcomanias by the trade and are used for the same purposes as the paper type transfer markings." *Ibid.* [Emphasis in original.]

Upon the record before this court no finding can be made, as suggested by plaintiff, that, as of the date of the enactment of the Tariff Schedules of the United States, the term "decalcomanias" "was known

in the trade uniformly and generally throughout the United States to include such articles not necessarily made of paper, but which by usage and general appearance perform the same function as paper decalcomanias, and thus equally includes the articles here at bar." (Plaintiff's brief, p. 23).

Plaintiff's evidence on the question of commercial designation is wholly insufficient to meet the standard established by the cases. In the incorporated case the court stated that "no commercial designation has been claimed". On the assumption that such a claim is being made in the present case, it is now therefore equally appropriate to say that "the proof is insufficient to meet the requirements that the term as used in commerce have a meaning other than the common meaning, which is general, definite, and uniform throughout the country." 58 Cust. Ct. at 534.

The 1929 and 1948 *Summaries of Tariff Information*, considered by the court in the *F. H. Kaysing* and *M. H. Garvey* cases, described decalcomanias as being printed on paper from which the imprint may be transferred to a permanent surface. These descriptions clearly would not encompass exhibit 1, being the articles in question. Furthermore, while the language of paragraph 1406 of the Tariff Act of 1930, which was pertinent in the incorporated case, provided for articles "composed wholly or in chief value of paper", there is no indication that Congress intended to include any article other than one of paper within the designation of "decalcomanias". Nothing in the quotations submitted by plaintiff from the 1960 *Tariff Classification Study* or in headnote 1 of schedule 2, part 5 of the tariff schedules would indicate otherwise. The quotation from page 140 of the *Tariff Classification Study* contains the sentences "[d]ecalcomanias are imprinted on *paper* usually in colored pigments, which may be transferred from the *paper* to a permanent surface" and "[c]eramic decalcomanias are for use in transferring designs to pottery and other ceramic ware and are usually printed on a duplex type of *paper*. The different rates according to weight are to compensate for differences in weight arising when the article may be imported either as print on the duplex *paper* or with the heavy backing sheet removed from the thin sheet actually bearing the imprint." [Emphasis added.]

Surely this 1960 study, which constitutes an important element in the legislative history of the term "decalcomania", does not support plaintiff's contention of a change in the prior established meaning of the word. It would seem clear that, to the contrary, it is persuasive evidence that Congress wished to continue the common meaning of the word as it was understood and defined in the lexicographic works cited. Nothing cited by plaintiff indicates that for tariff purposes the

term "decalcomania" should have a meaning different from, or broader than, its common meaning.

In support of its contention that the controverted merchandise consists of "decalcomanias", plaintiff has quoted certain passages from the *Brussels Nomenclature*. Specifically, plaintiff asserts that "[t]he fact that [the articles in question] are in chief value of rubber should not take them out of the 'decalcomania' category, since the *Brussels Nomenclature* * * * recognizes * * * that the printing 'may be on other materials' than paper, provided that the article possesses the other essential characteristics called for." (Plaintiff's brief, p. 14)

In an appropriate case, the *Brussels Nomenclature* may be considered as a source of legislative history for the Tariff Schedules of the United States. See *Herbert G. Schwarz, dba Ski Imports* v. *United States*, 57 CCPA 19, C.A.D. 971 (1969); *W. R. Filbin & Co., Inc.* v. *United States*, 63 Cust. Ct. 200, C.D. 3897 (1969), and cases cited therein. It would seem obvious, however, that no reliance may be placed on the *Brussels Nomenclature* where it expresses a meaning different from that clearly expressed by the Tariff Commission itself in its *Tariff Classification Study*. An examination of the appropriate heading of the *Brussels Nomenclature* will reveal that it is not the source of the present tariff item 273.75 which covers decalcomanias.

Heading 49.08 of the *Brussels Nomenclature covers* "Transfers (Decalcomanias)", and includes transfers produced and supplied mainly for the amusement of children. Heading 49.08 provides in part:

> "Transfers or decalcomanias consist of pictures, designs or lettering in single or multiple colours, lithographed or otherwise printed on absorbent, lightweight paper (or sometimes thin transparent plastic sheeting), coated with a preparation, such as of starch and gum, to receive the imprint which is itself coated with an adhesive. This paper is often backed with a supporting paper of heavier quality. The designs are sometimes printed against a background of metal leaf.

> "When the printed paper is moistened and applied with slight pressure to a permanent surface (e.g., glass, pottery, wood, metal, stone or paper), the coating printed with the picture, etc., is transferred to the permanent surface.

> "Transfers may be used for decoration or utility purposes, e.g., for decorating pottery or glass, or for marking various articles, such as vehicles, machines and instruments.

> "Transfers produced and supplied mainly for the amusement of children are also covered by this heading as are also articles such as embroidery and hosiery transfers which consist of papers on which designs are outlined in pigment which is transferred,

usually to a textile surface, by pressure with a heated smoothing iron." *Brussels Nomenclature*, Vol. II, p. 461 (1964).

Item 273.75 of the tariff schedules provides for "[d]ecalcomanias (except toy decalcomanias) : * * * [o]ther: [n]ot backed with metal leaf". This arrangement is similar to that of paragraph 1406 of the Tariff Act of 1930, as modified, which uses the words "[d]ecalcomanias (except toy decalcomanias and decalcomanias in ceramic colors)". Moreover, the *Tariff Classification Study* stated at page 140 that "[i]tems 273.65 through 273.80 would continue without rate change the present provisions for decalcomanias in paragraph 1410 [1406]." It would seem clear therefore that the tariff schedule item 273.75 is derived from paragraph 1406 of the Tariff Act of 1930, and not from the *Brussels Nomenclature*. Under the circumstances presented, the *Brussels Nomenclature* cannot be regarded as a reliable or proper source of legislative history. See *W. R. Filbin & Co.* v. *United States*, *supra; Hollywood Accessories, Division of Allen Electronics & Equip. Co.* v. *United States*, 60 Cust. Ct. 360, C.D. 3391, 282 F. Supp. 499 (1968).

It may nevertheless be observed that heading 49.08 of the *Brussels Nomenclature* requires that "the coating printed with the picture, etc., is transferred to the permanent surface", and not the entire article. Since the importations at bar are vulcanized to the permanent surface, it would appear that they would not even meet the requirements of the *Brussels Nomenclature* for classification as decalcomanias.

These factors have led the court to conclude that the controverted merchandise, which is of rubber and is vulcanized in its entirety to a permanent surface, cannot, for tariff purposes, be considered decalcomanias classifiable under item 273.75 of the Tariff Schedules of the United States.

The foregoing conclusions make it unnecessary for the court to consider further plaintiff's argument that the term "decalcomanias", found in item 273.75 of the tariff schedules, "is an *eo nomine* designation including all forms of the article." This contention was likewise disposed of in the decision of the court in the incorporated case. *M. H. Garvey* v. *United States*, 58 Cust. Ct. at 532–533.

It is true that if merchandise possesses the essential characteristics of a specifically named or enumerated article in a tariff provision, such merchandise is to be included within the enumerated or named article. *Nomura (America) Corp.* v. *United States*, 62 Cust. Ct. 524, C.D. 3820, 299 F. Supp. 535 (1969), *appeal pending*. The indispensable prerequisite, however, is that the controverted merchandise possess the essential characteristics of the named article. *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 365, 367, T.D. 40520 (1924) ; *Consolidated*

*International Equipment & Supply Co.* v. *United States*, 63 Cust. Ct. 230, C.D. 3901 (1969), *appeal pending; The Bendix Corporation* v. *United States*, 57 Cust. Ct. 184, 187, C.D. 2759 (1966). The principle that an *eo nomine* designation of an article will include all forms of that article clearly cannot apply where a particular article is excluded from the common meaning of the *eo nomine* designation. See *Borneo Sumatra Trading Co., Inc.* v. *United States*, 64 Cust. Ct. 185, C.D. 3980, 311 F. Supp. 326 (1970), where "crownboard", a product with a hardboard core, did not fall within the *eo nomine* provision for plywood under paragraph 405 of the Tariff Act of 1930, the common meaning of which was held to require that all of its plies, including the core, be made of wood. See also *Hoyt, Shepston & Sciaroni et al.* v. *United States*, 52 Cust. Ct. 7, C.D. 2426 (1964), *aff'd*, 52 CCPA 101, C.A.D. 865 (1965), where the statutory criteria, under paragraph 1755 of the Tariff Act of 1930, for sausage casings requiring that they be made of animal parts and organs, excluded from its purview casings made "wholly of artificial products".

In view of the foregoing, the court finds that the statutory language of item 273.75 of the Tariff Schedules of the United States pertaining to decalcomanias is not intended to include the controverted merchandise, and the protests are, therefore, overruled.

Judgment will issue accordingly.