ORDERED, that the entries shall be reliquidated accordingly.

(C.D. 4686)

MITSUBISHI INTERNATIONAL CORP. *v.* UNITED STATES

(Decided January 26, 1977)

*Glad, Tuttle & White (Edward N. Glad* of counsel); *Jun Mori*, associate counsel; for the plaintiff.
*Irving Jaffe*, Acting Assistant Attorney General (*Max F. Schutzman* and *Andrew P. Vance*, trial attorneys), for the defendant.

RE, Judge: The questions presented in this case, which involves nine entries, pertain to the valuation and classification of certain merchandise imported into the United States. The merchandise consists of three complete and four partial penstocks imported from Japan, and entered at Los Angeles, California from December 8, 1969 to October 7, 1971.

A penstock is a conduit or pipe for conducting water. As described by one of the witnesses, David Anderson, a mechanical design engineer with the Los Angeles Department of Water and Power, and contract administrator of the penstock contract under which the imported items were installed, it is—

"* * * a large pipe carrying water from a resevoir [sic] or tunnel to a powerhouse for the purpose of power generation or, in the case of our project, also to carry the water from the powerhouse, pumping it uphill back into the reservoir. It's a pump-storage project." (R. 32.)

The penstocks, which were installed in the Castaic Power Plant in Castaic, California, were manufactured by Mitsubishi Heavy Industries, Ltd., Tokyo, Japan [MHI] for its parent company, Mitsubishi Shoji Kaisha, Ltd., Tokyo, Japan [MSK]. They were sold to plaintiff, a Los Angeles trading company also owned by MSK. Plaintiff had contracted to furnish the penstocks to Macias-Farwell, the successful bidder on a contract awarded by the Los Angeles Department of Water and Power for the construction of the Castaic power project.

The penstocks arrived in this country in packages or bundles described on the invoices as straight pipe, bent pipe, platform, bolt nut, reducer, fixed base plate, sliding base plate, bolt and washer, articulation joint, rocking beam assembly, support, bearing plate, test pieces, plate and X-ray film.

## I. *The appraisement question presented*

On the valuation question, it is undisputed that the articles were separately appraised on the basis of constructed value as defined in

section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The appraisements were at single unit values, net, packed. However, the appraised values, which appear in red ink on either the commercial or customs invoices are expressed, in some instances, only as totals of two or more articles without showing a separate appraised value for each item.

Constructed value is defined in section 402(d) as follows:

"(d) For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States."

The customs import specialist, Mrs. Lois A. Fields, who made the initial advisory appraisements, testified as to how she ascertained the elements of the constructed value for the merchandise. As part of the cost of materials and fabrication, she included an amount equal to the value of the "assists," which consisted of the drawings, blueprints and specifications supplied by the Los Angeles Department of Water and Power to prospective bidders on the penstock portion of the Castaic power project. She also included an amount for profit since she had "indications there was no profit in the invoice value."

It was stipulated that the issue on this phase of the case, is whether constructed value should include the value of the bid drawings represented by exhibits 1 and A. It was also stipulated that the visits of engineers from the Los Angeles Department of Water and Power to Japan were not considered part of constructed value. The bid drawings, blueprints and specifications (exhibits 1 and A) were sold to prospective bidders for $200, a figure presumably already included in the appraisements. That figure, however, is separate and distinct from the contested value assigned to the drawing by the import specialist and added to the cost of materials and fabrication.

Plaintiff, limiting its valuation claim to the bent pipe, articulation joints, reducers, sliding and fixed base plates, and test pieces, agrees that constructed value is the proper basis of appraisement, but contends that the correct constructed values are the "invoiced unit values." [1]

It is fundamental in customs law that the party challenging the official appraisement carries the dual burden of establishing that the presumptively correct appraised value is erroneous, and that the claimed value is correct. 28 U.S.C. § 2635; *Dana Perfumes Corp.* v. *United States*, 63 CCPA 43, C.A.D. 1162, 524 F. 2d 750 (1975). In an appropriate case, however, the so-called separability doctrine or rule, may relieve the contesting party of the burden of establishing every element of the claimed statutory value. This rule provides that if an appraisement is deemed separable, the importer may challenge any one or more of the items entering into the appraisement while relying upon the presumption of correctness as to all other elements of value, *United States* v. *Bud Berman Sportswear, Inc.*, 55 CCPA 28, C.A.D. 929 (1967); *United States* v. *Chadwick-Miller Importers, Inc., et al.*, 54 CCPA 93, C.A.D. 914 (1967); *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371 (1947).

Generally, an appraisement is separable where it is at the invoiced "first cost," *per se* price, or ex-factory price, plus various charges, but not where it is expressed at a single unitary price, such as an f.o.b. port of exportation price, unless there is proof in the record showing what the appraiser actually did. *United States* v. *Bud Berman Sportswear, Inc., supra; United States* v. *Chadwick-Miller Importers, Inc., supra; Concord Electronics Corp.* v. *United States*, 69 Cust. Ct. 241, A.R.D. 304, 345 F. Supp. 1000 (1972), *appeal dismissed*, 60 CCPA 185 (1972); *United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71 (1957).

Thus, an appraisement is not separable merely because the appraised value is the mathematical equivalent of the invoice price plus charges or commission. *Haddad & Sons, Inc.* v. *United States*, 53 Cust. Ct. 423, R.D. 10825 (1964). Nor is it separable because it is equal to an invoiced c.i.f. price which included certain enumerated charges unless the record shows that such charges were included by the appraising officer in the *per se* appraised values. *Sharwell Bros. Shoe Co. et al.* v. *United States*, 61 Cust. Ct. 598, A.R.D. 244 (1968); *Luckytex, Ltd.* v. *United States*, 56 Cust. Ct. 575, R.D. 11119 (1965).

A constructed separation, however, may be effected if there is evidence to show that the appraising officer in fact calculated value by adding charges to or subtracting them from the invoice price.

---

[1] In its brief plaintiff urges that the constructed values should be the same as the "invoiced and entered values." As will be shown, the entered and invoiced values are not the same.

*United States* v. *Gehrig, Hoban & Co., Inc.* 54 CCPA 129, C.A.D. 924 (1967); *United States* v. *Louis Goldey Co., Inc.*, et al., 64 Cust. Ct. 868, A.R.D. 275 (1970), *appeal dismissed*, 58 CCPA 165 (1971). Hence, a unitary appraised value need not "remain· inviolate" if it can be broken down into its component parts by satisfactory evidence. *United States* v. *Louis Goldey Co., Inc., et al. supra*, 64 Cust Ct. at 871; *United States* v. *Shalom & Co.*, 57 Cust. Ct. 767, A.R.D. 216 (1966), *appeal dismissed*, 55 CCPA 115 (1968).

In the present case, the cornerstone of plaintiff's claim is the alleged separability of the appraisements which, as noted, were at *per se* unit values. As indicated in its post trial brief, this claim is based upon the assumption that the appraising officer "*added* two amounts to the *invoiced values* * * *.*" (Emphasis added.) In plaintiff's words, it is challenging only the "*addition to invoiced values* made by the appraising officer for alleged assists and for profit * * *.*" (Emphasis added.) Consequently, plaintiff contends that the *invoiced* prices are the correct statutory constructed values, and contests only the alleged "additions" thereto.

The thrust of defendant's response is that separability may not be effected in this case because there is no breakdown of the "additions" to show how much was added for "assists" and how much for profit. Furthermore, defendant asserts that there is no showing that the advisory appraisements were accepted by the district director.

The basic problem, apparently overlooked by the parties, is that the evidence of record pertinent to separability, namely, the official papers (particularly the consumption entries and the commercial and special customs invoices) and the testimony of the import specialist, do not support plaintiff's premise or assumption that the appraised values were arrived at as alleged. Moreover, in some instances, plaintiff's contention would result in a value higher than the appraised value.[2]

A statement of the invoiced, entered and appraised values, as they appear on the pertinent documents, is necessary for an understanding of the legal issues presented. As for the invoice values, it is to be noted that the total c.i.f. values are listed on all the entries. The

---

[2] The notations on the summary sheets indicate that the entered values were advanced in appraisement. Defendant also seems uncertain as to what was done. While it states initially (brief at 1) that the import specialist testified that—

"* * * in rendering her advisory appraisement, she increased the *entered* values by adding thereto an amount equal to the value of assists supplied by the Los Angeles Department of Water and Power, and an amount equal to the profit which she felt had not been included in those *entered* values (R. 24–25) * * *." (Emphasis added.)

it subsequently asserts that she testified to adding (brief footnote 2 at 25)—

"* * * not one but *two* distinct amounts to the *invoice values*, i.e., an amount for engineering assists *and* an amount equivalent to the profit figure which she felt had been omitted therefrom. * * * the Court has absolutely no way of knowing what proportion of the total amount over and above the *invoice values* was allocated for assists, and what amount was assigned to profit." (Emphasis added to "invoice values.")

commercial invoices list a c.i.f. unit price in United States currency for each article except in the case of the following entries, on which a c.i.f. price is given for two or more articles without a breakdown for each item:

entry 207330 (articulation joint and reducer)
" 100339 (articulation joint and reducer; and fixed and sliding base plates)
" 167995 (articulation joint and reducer)
" 157425 (straight and bent pipe invoiced as "pipe"; reducer and test piece; and sliding and fixed base plates)

The special customs invoice accompanying entry 131567, which has no commercial invoice attached, lists a total c.i.f. price for fixed and sliding base plates.

The invoiced c.i.f. values also appear on the special customs invoices. Except for entry 167995 two "N/D" [nondutiable] charges are also listed: ocean freight and insurance premium. The entered (F.O.B. Japan) value is shown on these invoices as the total invoice value less the two nondutiable charges.

Concerning the merchandise in issue, only the total entered values are shown on entries 100339, 131567, 157425, 167995, 207330, and 105122. On the remaining three entries, while some articles are entered separately, at least two or more are entered together under a total value.

As to the appraisements, the court notes that in some instances single unit values were returned for individual items. In others, however, as previously indicated, *only total appraised values* are shown for two or more articles without a breakdown for each item. Thus, a separate value of $3,757 is listed for supports (an item not in issue) covered by entry 167995, while a total appraised value of $53,205 is shown for the articulation joints, reducers, rocking beam assemblies (not in issue) and bearing plates (not in issue) covered by that same entry.

The salient aspect of these appraisements is that, where appraised values are separately shown for particular items, the values in some instances are *less*, whereas in others they are *greater* than the *invoiced* unit values. For example, entry 131567, which covers the bent pipe, shows an invoice unit value of $8,100 and the lower appraised value of $7,366. On the other hand, the sliding and fixed base plates, which were invoiced at $8,853, were appraised at $9,599. These variations patently belie plaintiff's assertion that the appraisements were arrived at through the simple formula of making additions to the invoice values.

Furthermore, because some of the items in issue either were not separately invoiced or entered, or their appraised values were not

separately listed, the amounts by which they were advanced or increased in the appraisement (over either the invoiced or entered value) cannot be ascertained on this record. Moreover, the amounts included in the import specialist's calculations in those values for assists and profit also cannot be determined.

It cannot be questioned that the basic prerequisite for application of the separability doctrine is that the disputed charges be ascertainable. Thus, even assuming *arguendo*, the merits of plaintiff's substantive claim, there is nothing in this record [3] which would permit the court to make a proper finding of statutory constructed value as required by law.[4]

In finding that plaintiff has failed to establish its separability claim, the court has also considered the uncontroverted testimony of the import specialist that she separately appraised each of the disputed items; made separate findings as to the cost of materials and fabrication, which she assumed was not constant throughout the 1969–71 period; used separate figures in determining general expenses and profit; had not included a cost for containers as the merchandise was not packed; and that she had constructed the value of the merchandise in accordance with all reasonable ways and means available to her at the time. Thus, in making her advisory appraisements, the import specialist properly utilized all of the elements expressed in the statutory constructed value formula without regard to the invoiced and entered values.[5] In the absence of testimony, or other evidence, as to the specific costs or amounts entering into the findings of the import specialist, the advisory returns, assuming their adoption by the dis-

---

[3] For example, the bent pipe covered by entry 157425, was invoiced, together with straight pipe (not in issue) at one c.i.f. price of $8,194; entered, together with straight pipe, reducers, sliding and fixed base plates, test pieces and supports at $11,918; and appraised at $3,880. The invoice unit value for both reducers and test pieces is $4,100 and for the base plates is $2,000. But reducers, plates and test pieces are lumped together under a total appraised value of $5,723.·

[4] The official papers were moved into evidence prior to the calling of the import specialist as a witness, and were retained by counsel for use during her testimony. They were not available to the court for its examination until the conclusion of the trial.

[5] The only testimony pertaining to the witness' method of including, or adding the disputed charges is found in the following colloquy (R. 24–25):

> MR. GLAD: Now, did you add anything to your appraisement beyond that value which appeared on the invoices?
>
> THE WITNESS: Yes.
>
> MR. GLAD: And what was that?
>
> MR. SCHUTZMAN: Objection, Your Honor. It is evident from the invoices how much she marked up the entered value.
>
> JUDGE RE: It is evidently a mathematical computation. Why can't she give it if she knows it?
>
> MR. GLAD: Please repeat the question.
>
> (Whereupon, the question was read by the Court Reporter.)
>
> THE WITNESS: There were two things [sic] I added to the materials and fabrication. [sic] An amount equal to assist applied [supplied?] by the Department of Water and Power.
>
> MR. GLAD: And the second one?
>
> THE WITNESS: The second one I made an addition which I felt was the equal to the profit which [sic] I had indications there was no profit in the invoice value.

In the context of the witness' entire testimony, it indicates that, in making the ·appraisements, she included amounts for assists and for profit which she believed were not reflected in the invoice values.

trict director, reflect a locked-in unit value structure incapable of fragmentation on this record.

Having failed to prove that the appraisements are separable, it became incumbent upon plaintiff to establish all the material elements of constructed value as set forth in section 402(d), *supra*. The evidence of record on this aspect of plaintiff's case does not require elaborate treatment. Since plaintiff had relied essentially on its separability claim, and devoted its efforts mainly to challenging the "additions" for assists and profits, it attempted to introduce testimony as to *estimates* of costs of materials and fabrication. Such testimony bears no relation to actual costs or the costs employed in producing such or similar merchandise at a time preceding the date of exportation of the articles. It is therefore without probative value in establishing the first element of statutory constructed value. In light of this failure of proof, it is unnecessary to consider the evidence adduced as to the other elements of plaintiff's claimed constructed values.

It is the determination of the court that the appraised constructed values are not separable, that plaintiff has failed to meet its statutory burden, and that the statutory constructed values of the merchandise at bar are the presumptively correct appraised values. Accordingly, the appraised values remain in full force and effect.

As stated previously several of the appraisements are expressed on the invoices only as totals of the appraised values returned for two or more items.[6] For example, the appraised values of the articulation joints are not separately stated, but are shown only as part of a combined total appraisement covering other articles. As will be indicated, the court's determination as to the proper classification of the articulation joints requires a separate return of value for the other articles included in those total appraisements so that the entries may be lawfully reliquidated.

## II. *The classification question presented*

On the classification question, plaintiff has limited its claim to a) the articulation joints; b) the reducers; and c) the bent pipe.

The articulation joints and the reducers were classified under the basket provision for articles of iron or steel other than of cast iron or of tin plate, not coated or plated with precious metal, under item 657.20, TSUS, as modified by T.D. 68–9, and were assessed with

---

[6] Plaintiff does not claim that the appraisements were erroneous on this ground, and as the import specialist testified that she had made separate findings of value for each article, it must be assumed that the articles were separately appraised at values which, when added together, equalled the total appraised values shown on the invoices. *Concord Electronics Corp.* v. *United States*, 69 Cust. Ct. 241, A.R.D. 304, 345 F. Supp. 1000 (1972), *appeal dismissed*, 60 CCPA 185 (1972). Of course, failure to make separate determinations of value would not have relieved plaintiff of the requirement of establishing affirmatively the correctness of the claimed values.

duty at the rate of 15.5, 13, or 11 per centum ad valorem, depending upon the date of entry.[7]

The bent pipe was classified as pipe fittings of iron or steel, other than cast iron, under item 610.80, TSUS, as modified by T.D. 68–9 and was assessed with duty at the rate of 15.5, 14, or 12.5 per centum ad valorem, depending upon the date of entry

Plaintiff contends that the articulation joints, the reducers, and the bent pipe are all properly classifiable under item 610.32, TSUS, as pipes and tubes of iron (except cast iron) or steel, other than alloy iron or steel, welded, jointed, or seamed, with walls not thinner than 0.065 inch, and circular cross section of 0.0375 inch or more in outside diameter. Hence, plaintiff maintains that the proper rate of duty should be 0.3 cent per pound.

While defending the official classification, the government contends, alternatively, that "should the Court determine that the reducers and articulation joints were erroneously classified, * * * proper classification in such a case would be under item 610.80, TSUS, *supra*, as pipe and tube fittings of iron or steel." [8]

The pertinent provisions of the tariff schedules read as follows:

Schedule 6, part 2, subpart B:

Classified:

Bent pipe

"Pipe and tube fittings, of iron or steel:

| | | | | | | |
|---|---|---|---|---|---|---|
| | * | * | * | * | * | * | * |
| 610. 80 | Other fittings _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 15.5%, 14%, 12.5% ad val." |

Schedule 6, part 3, subpart G:

Articulation joints and reducers

"Articles of iron or steel, not coated or plated with precious metal:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | * | * | * | * | * | * | * |
| | Other articles: | | | | | | |
| | * | * | * | * | * | * | * |
| 657. 20 | Other _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 15%, 13%, 11% ad val." |

---

[7] The correct rate of duty for merchandise entered for consumption during 1969 and classified under item 657.20, as modified by T.D. 68–9, was 15%, not 15.5%. The reducers entered during the period were improperly assessed at the 15.5% duty rate. However, plaintiff has made no claim with respect to this error.

[8] Whereas item 657.20, under which the reducers and articulation joints were classified, is a general or basket provision, item 610.80 is a more specific provision. See General Interpretative Rule 10(c). Although defendant failed to amend its answer to include its alternative claim, in the spirit of rule 4.8(b) the amendment is hereby deemed to have been made.

Claimed:

Schedule 6, part 2, subpart B:

> "Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel:
> > Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section:
> > > Other than alloy iron or steel:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | * | * | * | * | * | * | * | * |

610. 32                0.375 inch or more in outside diameter\_ \_ \_ \_ \_ \_ \_ \_ \_ \_    0.3¢ per lb."

In customs classification cases, plaintiff has the dual burden of establishing that the presumptively correct classification of the customs officials is incorrect, and that the claimed classification is proper. See 28 U.S.C. § 2635; *United States* v. *L. Batlin & Son, Inc.*, 61 CCPA 17, C.A.D. 1111, 487 F. 2d 916 (1973). As a consequence of this statutory presumption, and firmly established judicial authority, plaintiff's protest must fail unless it affirmatively establishes that its claimed classification for the merchandise is correct.

In order that the articulation joints, reducers and bent pipe come within the purview of item 610.32, TSUS, they must initially meet the following criteria:

1. Be welded, jointed or seamed.
2. Have walls not thinner than 0.065 inch.
3. Have circular cross section.
4. Be other than alloy iron or steel.
5. Be 0.375 inch or more in outside diameter.

The undisputed testimony of plaintiff's witness, Mr. Takahashi, chief engineer at MHI, who has designed penstocks and worked on the designs used in manufacturing the penstocks at bar, establishes that the articles are welded, have walls not thinner than 0.065 inch and are 0.375 inch or more in outside diameter.[9] The exhibits of the specifications and photographs of the penstocks show that they also have a circular cross section. The articles are made of "normalized steel" which comports with the requirements set out by the Los Angeles Department of Water and Power in its bid specifications for manufacture of the Castaic penstocks. The chemical composition of the steel is shown in the specifications prepared by MHI. A comparison of this data with the definition of "alloy iron or steel" set forth in headnote 2(h) of schedule 6, part 2, subpart B, satisfies the court

---

[9] The witness testified that the articles have a minimum diameter of 60 inches and that the walls of all the items herein have a minimum thickness of ⅛ inch. See also plaintiff's [collective] exhibit 11; "Record of Welding Procedure Qualification Test" and "Record of Welder Performance Qualification Test" prepared by MHI in connection with the manufacture of the articles.

that the imported merchandise is not alloy iron or steel.[10] Hence, the court finds that plaintiff has met the initial criteria for classification of the controverted merchandise under item 610.32, TSUS.

Three of the five witnesses called by plaintiff gave testimony bearing on its classification claim. In addition to Messrs. Anderson and Takahashi, the third witness was Mr. Taiji Owada, general manager of the machinery department of Mitsubishi Corporation of Japan, Osaka branch, who has bought and sold pipe for 15 to 20 years. He dealt in pipe in the United States from 1967 through 1973 when he was assistant manager and subsequently manager of plaintiff's machinery department in Los Angeles.

Defendant recalled Mr. David Anderson as its own witness, and also called two others. The first was Mr. Gail S. Preston, a civil engineer and supervisor since 1969 of a group responsible for the design, manufacture and construction engineering of plate work, including pipe and penstocks, for the American Bridge Division of the United States Steel Corporation in Los Angeles. The second was Mr. Robert Moehle, a civil engineer employed by the Water District of Southern California for 22 years, who has worked on pipe, but not on penstocks.

Although the opinion testimony of the witnesses differed on whether the articles are pipe or pipe fittings, there was no dispute as to their physical shape, or the function they serve in the Castaic penstock system.

The articulation joint, as imported, according to the witness Anderson, consists of a "straight piece of pipe" with two ring girders welded thereon. The ring girders, which are also present on all the imported and invoiced straight pipe (not in issue in this case), serve to support the pipe, and to withstand the pressure and weight of the water.

After importation, the articulation joint is connected by means of articulation couplings to adjacent pieces of pipe. The couplings are supplied by Dresser Industries, a domestic concern located in Pennsylvania. The function of the articulation joint and attached couplings,

---

[10] Exhibit 8, p. 2, Table I, lists the chemical requirements of the steel, as follows:

| | Ladle Analysis | Check Analysis |
|---|---|---|
| | % | % |
| Carbon, Max. | 0.22 | 0.24 |
| Manganese | 0.70 Min. | 0.65 Min. |
| | 1.50 Max. | 1.55 Max. |
| Phosphorus, Max. | 0.035 | 0.045 |
| Sulphur, Max. | 0.040 | 0.050 |
| Silicon | 0.15 Min. | 0.13 Min. |
| | 0.50 Max. | 0.55 Max. |
| Copper, Max. | 0.20 | 0.20 |
| Vanadium, Max. | 0.080 | 0.080 |

The percentages of the foregoing elements are below the figures set forth in headnote 2(h), *supra*, for establishing that the material is alloy iron or steel.

which are located in the powerhouse, is to allow for longitudinal movement between the adjacent pipe sections, and for angular deflection if the powerhouse were to shift. The couplings permit the relative displacement of these sections without leakage of water.

The reducers were described by Mr. Anderson as "short sections of pipe with a diameter upstream larger than the diameter downstream." Of the nine reducers contained in these shipments, two have a 6-inch reduction in diameter over a 9-foot length; six have a reduction of 6 feet, 2 inches over a length of 24 feet, 6 inches; and one has a diameter reduction of 1 foot over a length of 11 feet, 6 inches. The purpose of the reducers is to reduce the water pressure, thereby keeping the maximum wall thickness of the pipe down to under 2 inches. As the thickness of the pipe is directly proportionate to its diameter for a given pressure, reducing the diameter downstream reduces the pressure and the necessity of increasing wall thickness.

The articles invoiced as "bent pipe" are made up of several pieces of straight pipe fitted together in a manner that will form a bend. The maximum angle of bend in these articles is 60 degrees and 2 minutes, and the minimum angle of bend is 4 degrees, 2 minutes and 15 seconds. These articles allow the penstock to follow the contours of the hillside on which the penstock system is built. The bent pipe, like much of the straight pipe, is imported with stiffener rings. These rings serve to stiffen the wall of the pipe, to protect it from destructive vibration, and to withstand external pressure.

Mr. Anderson testified that the addition or presence of ring girders and stiffeners does not make pipe anything more than pipe. Mr. Owada stated that the definition for pipe in the trade in Japan is no different from that in the United States; that pipes are used to convey liquids and gases from one place to another; and that, in his opinion, the articles in issue are pipe. Mr. Takahashi stated that a penstock is a pipe.

Mr. Preston testified that a pipe fitting is something that changes the pipe's diameter or alignment, i.e., changes the directional flow; and that the bent pipe and reducers, shown on plates PA 103 and PA 106 in exhibit 1, are fittings. Although acknowledging that bent pipe changes the directional flow in a pipe system, he stated that bent pipe, which is made from bending a piece of straight pipe, is still a pipe.

According to Mr. Moehle, pipe fittings are pieces which "require additional fabrication other than the pipe itself." He considers the reducers and bent pipe, depicted on plates PA 103 and PA 106, to be fittings.

Plaintiff contends that it has established that the controverted articles, whether straight, bent or reduced in diameter at one end,

come within the common meaning of pipes and tubes, and are therefore within the ambit of item 610.32. Defendant, on the other hand, claims that the record proves that the bent pipe was properly classified as pipe and tube fittings under item 610.80, and that the reducers and articulation joints, by virtue of their physical characteristics, have passed beyond the stage of mere pipe. Thus, defendant urges that they are not within the purview of the "pipe" provision. Without abandoning the official classification, defendant has also endeavored to establish their classification as pipe and tube fittings under item 610.80.

It is settled that, absent a contrary legislative intent, the common meaning of a term controls the construction and interpretation of the tariff statutes. The common meaning of a tariff term is a question of law for the court to decide. In making its determination the court may consider the testimony of witnesses, which is advisory only, and may consult lexicographic and other authorities. See *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388 (1948); *Nomura (America) Corp.* v. *United States*, 62 Cust. Ct. 524, C.D. 3820, 299 F. Supp. 535 (1969), *aff'd*, 58 CCPA 82, C.A.D. 1007, 435 F. 2d 1319 (1971); *Mattel, Inc.* v. *United States*, 76 Cust. Ct. 84, C.D. 4639 (1976); *Border Brokerage Company, Inc.* v. *United States*, 60 Cust. Ct. 87, C.D. 3270, 279 F. Supp. 157 (1968).

### a) *The articulation joints*

As for the articles invoiced as articulation joints, it is apparent that this appellation is a misnomer when applied to the merchandise in its condition *as imported*. The article, as evidenced by the drawings in exhibit 1 and the record testimony,[11] was imported in the form of straight pipe. It was thereafter attached at either end to domestically produced articulation couplings for use as previously described in the penstock system. That after importation the article as assembled might constitute something other or more than pipe is not determinative of the tariff classification of the imported article. It is fundamental in customs law that the classification of imported merchandise is determined by its condition as imported. As stated by Mr. Justice Hughes, "[t]he inquiry must be—Does the article, as imported, fall within the description sought to be applied?" *United States* v. *Citroen*, 223 U.S. 407, 414, 32 S. Ct. 259 (1912). See also *United States* v. *Baker, Perkins, Inc., et al.*, 46 CCPA 128, C.A.D. 714 (1959); *Hurricane Import Co. et al.* v. *United States*, 58 Cust. Ct. 541, C.D. 3046 (1967).

---

[11] According to the undisputed testimony of Mr. Anderson, "[w]ithout the articulation coupling, we have no articulation joint," and "[t]his piece of pipe in here [the imported articulation joint] is the same as any other piece of penstock pipe."

On this record, it is clear that the so-called articulation joints are merely "pipe." The ring girders, also present on the invoiced straight pipe (not in issue), which had been classified as "pipe," merely support the pipe and enable it to withstand the pressures and weight of the pipe and water. They do not endow it with the capability of a new or different function. The ring girders are readily distinguishable from the fins on the economizer tubes in the case of *E. Green & Son (New York), Inc.* v. *United States*, 59 CCPA 31, C.A.D. 1032, 450 F. 2d 1396 (1971). In the *E. Green* case, the fins enabled the economizer tubes to accomplish the additional function of heating or cooling water flowing through them, thus making the imported articles something more than mere pipes or tubes.

It is, therefore, the determination of the court that the articulation joints are "pipe" within the meaning of the claimed tariff provision. Under the applicable rule of relative specificity, it is properly classifiable under item 610.32, as claimed, rather than under the more general basket provision of item 657.20, as classified. See General Interpretative Rule 10(c).

### b) *The reducers*

The imported *reducers*, on the other hand, have as their primary function not merely the conveyance of water, but the *reduction* of water pressure on the downstream section of the penstock. This attribute causes the reducers to come within the reasoning of the *E. Green* case, *supra*, wherein the appellate court stated:

> "* * * We are particularly impressed by exhibit 1, which is a section of an economizer tube of the type imported. It is hard to see how such an article can be considered a "pipe" or "tube" of any description. It does not look like a pipe or tube in its shape and form, and, more importantly, its major function is not that of a pipe or tube. That is, the record establishes that while the economizer tubes do convey water, their primary function is to heat or cool the water flowing through their interior. The finned design of the economizer tubes was created solely to accomplish this function, and thus represents something more than a pipe or tube as those terms are commonly defined." 59 CCPA at 35.

It is clear from the foregoing that the reducers are more than pipes or tubes. Plaintiff is therefore in error in its claim that they are properly classifiable under item 610.32 as pipes and tubes of iron.

The defendant has alternatively claimed classification of the reducers under item 610.80 as pipe fittings. Thus, the court is requested to find a classification neither found by the customs officials nor raised by the plaintiff.

The protest in this case is filed pursuant to the provisions of section

514 of the Tariff Act of 1930, as amended.[12] A protest is the final declaration by which the importer communicates his objections to the customs officials. See *United States* v. *Lian*, 10 F. 2d 41, 42 (2d Cir. 1925). It also serves to establish the limits of the action instituted in this court under the provisions of 28 U.S.C. § 1582(a) (1970). Thus, the court may not render a judgment which would reclassify the merchandise beyond the limits of the issues as framed by the protest. See *In re Solvay Process Co.*, 134 F. 678 (C.C.N.D.N.Y. 1905).

In considering the defendant's alternative claim, the court notes the following:

*Audels Mechanical Dictionary* (1942) defines "pipe fittings" as follows:

> "Connections, appliances, and adjuncts designed to be used in connection with iron pipes, such as *elbows* and *bends* to alter the direction of a pipe; *tees* and *crosses* to connect a branch with a main; *plugs* to close an end; *bushings, diminishers* or *reducing sockets* to couple to pipes of different dimensions, etc." (Emphasis in original.)

*Knight's New American Mechanical Dictionary* (1883) defines a "pipe reducer" as follows:

> "A pipe coupling which is larger at one end than the other, to unite pipes of different diameters."

The *Dictionary of Mechanical Engineering*, Del Vecchio (1961), defines "fittings" as—

> "Parts of a pipe line other than straight pipe or valves, such as couplings, elbows, tees, unions and increasers."

Defendant's exhibit C, "AWWA Standard for Dimensions for Steel Water Pipe Fittings," 1959, published by the American Water Works Association, lists the various dimensions for fittings, including reducers, for service in piping systems in water works. Similarly, the section on pipe fittings (at 1077–99) in the *Mechanical Engineers' Handbook*, Marks (1941), also lists the dimensions for reducers. The *Summaries of Tariff Information* (1948), Volume 3, part 2, at 183, in a discussion of the cast-iron pipe fittings provision in paragraph 327 of the Tariff Act of 1930, state:

> "Cast-iron fittings for cast-iron pipe consist of the curves, joints, tees, reducers, etc., used as connections in cast-iron-pipe systems."

---

[12] Section 514 of the Tariff Act of 1930, as amended (19 U.S.C. § 1514 (1970)):

SEC. 514. FINALITY OF DECISIONS: PROTESTS.

(a) Finality of Decisions * * * decisions of the appropriate customs officer, including the legality of all orders and findings entering into the same, as to * * *

(2) the classification and rate and amount of duties chargeable * * *

shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest in whole or in part, is commenced in the United States Customs Court * * *.

As was observed in *L & B Products Corp.* v. *United States*, 66 Cust. Ct. 424, C.D. 4228 (1971), this court, in *Mitsubishi Shoji Kaisha, Ltd.* v. *United States*, 72 Treas. Dec. 500, T.D. 49226 (1937), held that "malleable iron pipe fittings comprising reducers, bushings, plugs, elbows, tees, couplings, etc." were within the *eo nomine* provision in paragraph 327 of the Tariff Act of 1930 for "cast-iron fittings for cast-iron pipe."

The reducers were classified under item 657.20, a general or basket provision for articles of iron or steel. Item 610.80, which covers pipe fittings, is admittedly a more specific provision. The reducers, therefore, in accordance with General Interpretative Rule 10(c), should have been classified under item 610.80, the more specific provision, and the provision under which the defendant makes its alternative claim. As previously noted, however, the classification controversy before the court is limited by the plaintiff's protest. Indeed, it has been said that the function of the court in such a case is to "pass upon the correctness of the allegations of the protest, rather than on the merits of the case * * *." *In re Solvay Process Co., supra* at 680.[13]

Since plaintiff has failed to establish its claim that the reducers were pipes and tubes under item 610.32, TSUS, its claim is overruled without affirming the classification.

### c) *The bent pipes*

Finally, as to the bent pipes, which have angles of bend ranging from approximately 4 to 60 degrees, it is noted that, although they carry water, their primary function is to allow the penstock "to obtain the contours of the hillside on which this penstock system was built." In other words, they are used to change the plane of the pipe line in order to follow the terrain. Thus, they serve the essential function of altering the direction of flow as required by the nature of the situs.

In this respect they are comparable to elbows, which have long been recognized as fittings by the dictionary definitions cited, and also by judicial decisions. *Herbert B. Moller and U.S. Wolfson Bros. Corp.* v. *United States*, 46 CCPA 89, C.A.D. 704 (1959); *Green Kay Corp. et. al.* v. *United States*, 29 CCPA 216, C.A.D. 193 (1942); *United States* v. *Grinnell Co.*, 16 Ct. Cust. Appls. 255, T.D. 42844 (1928); *Border Brokerage Company, Inc.* v. *United States, supra; Mitsubishi Shoji Kaisha, Ltd.* v. *United States, supra.* For example, the court is unable to discern any substantial difference between the sectional bent pipes in issue, which are depicted on the drawings in exhibit 1, and the 2-, 3- and 4-piece elbows that are shown on the AWWA dimension

---

[13] See also *J. E. Bernard & Co., Inc.* v. *United States*, 64 Cust. Ct. 525, 527, C.D. 4029 (1970), *appeal dismissed*, 58 CCPA 165 (1970). Defendant's claim for an alternative classification in that case was recognized by the court to be "without the possibility of obtaining an affirmative judgment for a higher rate of duty."

specifications comprising exhibit C, and which have angles ranging from 0–30, 31–60 and 61–90 degrees. Indeed, both articles serve the the same function of altering the directional flow of water in a pipe line. Hence, it is the conclusion of the court that these articles are more than mere "pipe," and are therefore not within the purview of the claimed pipe provision. *E. Green & Son (New York), Inc.* v. *United States, supra.* Accordingly, their classification as pipe fittings under item 610.80 is affirmed.[14]

In summary, for the reasons stated, a) plaintiff's claim for classification of the articulation joints as pipes or tubes under item 610.32, TSUS, is sustained; b) since the reducers are properly classifiable as pipe fittings under item 610.80, TSUS, plaintiff's claim for their classification under item 610.32, TSUS, is dismissed without affirming the official classification; and c) plaintiff's claim for classification of the bent pipe as pipes or tubes under item 610.32, TSUS, is also dismissed.

The foregoing determinations would normally conclude the questions raised except for the fact that the articulation joints, which were classified under item 657.20 at 13 per centum ad valorem, are to be reclassified in reliquidation under item 610.32 which carries a duty rate of 0.3 cent per pound. However, only total appraised values are shown on the invoices accompanying entries 167995, 207330 and 100339 for the articulation joints and all other articles which had been classified under item 657.20 and assessed at 13 per centum ad valorem.[15] Inasmuch as the other articles included in those total appraisements were properly assessed on the ad valorem basis, but the articulation joints are to be assessed on a per pound basis, the total appraised constructed values of the other articles must now be shown in order to reliquidate the entries properly.

Therefore, plaintiff's claim as to the appraisements is dismissed, and the disputed appraised values are affirmed except for the aforementioned total appraised values shown on entries 167995, 207330 and 100339. With respect to these three entries, the case is to be remanded for further disposition.

The parties are hereby ordered, within 30 days after entry of the judgment and order herein, to file with the court a joint statement

---

[14] Plaintiff's reliance on *Davis-Bilt Products Co.* v. *United States*, 28 Cust. Ct. 332, C.D. 1432 (1952), is misplaced. That case involved circular steel tubes which *after* importation, were cut into bends of varying degrees and then welded to straight lengths of tubing. It is quite clear that in their condition as imported the tubes did not constitute fittings. Furthermore, their classification as fittings was an issue never raised or considered. See *Herbert B. Moller and U.S. Wolfson Bros. Corp.* v. *United States, supra; Border Brokerage Company, Inc.* v. *United States, supra.*

[15] Entry 167995 shows only a total appraised value of $53,205, net, packed, for the articulation joints, reducers, rocking beam assemblies and bearing plates; 207330, $74,777 for the articulation joints, reducers and rocking beam assemblies; 100339, $75,998 for the articulation joints, reducers, and sliding and fixed base plates.

setting forth the total appraised constructed values of the (1) reducers, rocking beam assemblies and bearing plates covered by entry 167995; (2) reducers and rocking beam assemblies covered by entry 207330; and (3) reducers and sliding and fixed base plates covered by entry 100339. In the event that the parties advise the court of their inability to agree upon a joint statement, the matter shall be heard forthwith for the sole purpose of determining the appraised constructed values of the articles hereinbefore described.

Judgment will be entered accordingly.[16]

[16] The official papers in entries 167995, 207330 and 100339 shall be retained by the court until the final disposition of all matters herein.