(C.D. 2323)

WESTFELDT BROTHERS *v*. UNITED STATES

United States Customs Court, First Division

(Decided March 27, 1962)

*Solomon S. Goldman* for the plaintiff.
*William H. Orrick, Jr.*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: This protest relates to certain merchandise which was classified as stained glass windows under paragraph 230(a) of the Tariff Act of 1930, as modified by T.D. 52738 and T.D. 52836, with a duty assessment at the rate of 30 per centum ad valorem. Plaintiff claims that the merchandise is entitled to entry free of duty under the provision in paragraph 1774 of the Tariff Act of 1930, as amended, for shrines and parts thereof.

Two witnesses testified. Both appeared on behalf of plaintiff. Following is a summary of the testimony of Father Bernard Mistretta, pastor of the Church of the Sacred Heart, a Roman Catholic church located in Montegut, La., which is a rural community about 75 miles from New Orleans, where the articles in question were installed.

The Church of the Sacred Heart in Montegut, La. (hereinafter referred to as the "new church"), was erected in April 1956 and replaced its predecessor, which had been destroyed in 1954 by fire. The new church is about 120 feet long, and 50 feet wide. In the construction thereof, wired plate glass windows were installed. They were designed to serve as the regular windows of the building and were made as protection against weather. Each window was double-glazed and was installed in an aluminum frame, having grooves for two panes of glass. The plate glass windows were placed in the outer groove of the aluminum frame. Later, and after the new church had been built, the articles in question, which are made of so-called art glass, were imported and fitted into the inner groove of the original aluminum frames. There is a space of about 2 inches between the plate glass windows and the stained glass windows in question. Explaining the reasons for importing the present merchandise, Father Mistretta testified as follows (R. 8–9):

Q. Now, when the new church was erected was any provision made for placing statuary in the new church?—A. There were provisions made for two statues; the rest were afterthoughts, and we couldn't do too much after thinking, because the design of the building as it was drawn in quite a hurry, didn't permit creating niches or setting up the statuary in such a way that it would be out of the traffic area, and would really be set up as a shrine would.

Q. And what was the limitation that prevented your putting the statuary in the church proper?—A. We forgot about it when we designed the church, we didn't put into the design of the church places where we could erect shrines.

Q. And are there now places, or are there not places where statuary could be installed in the present church?—A. Oh, you could hang them from the chandeliers, but it wouldn't look too good. We have a blank wall at the rear

of the building, and again, you might be able to nail a pedestal to it somewhere, but it wouldn't go with the building; I wouldn't permit it.

Q. Then, Father, in view of the limitations which you have just described, what was then resorted to in lieu of the statuary that had been in the previous church?—A. We decided to put representations of these same persons in art glass, instead of in statuary.

Eleven stained glass windows are involved herein. In addition to a representation of the baptism of Christ by St. John the Baptist, the images depicted in these stained glass windows were described by Father Mistretta as follows (R. 9–10):

The Holy Family, St. Ann holding the Blessed Mother, St. Joseph, St. Charles, St. Peter and St. Isaac Jogues, who was a missionary to the Indians up in New York State, and who was the patron of our Indian people, of whom there are quite a few in the lower urban parishes where my parish is located.

And there are two others, there is St. Cecilia and St. Gregory in the choir, patron and patroness of music; and in the little breezeway going to the rear of the church, we have two children saints, St. Dominic and St. Maria Gorretti, young boy and young girl whom we hold up for the veneration of our young people.

The window with the representation of the baptism of Christ by John the Baptist is in the baptistry where people are baptized, and "they are received into membership in the church in a ceremony in which water is poured over them." (R. 11.) The windows with the images of St. Cecilia and St. Gregory are in the choir loft. Two small windows, about one-quarter of the size of the ones in the main church, with images of St. Dominic and St. Maria Gorretti, were placed in little hallways, referred to as "breezeways." The remaining six windows are the principal windows; they were installed in the main body of the church, three on each of the sidewalls. All of the art glass images were specifically selected for their devotional and inspirational influence over parishioners, both young and old.

Plaintiff's second witness was the importer of the present merchandise. He testified that he ordered these stained glass windows on the recommendation of the Rudolph Compton Studios, the painter and decorator of the inside of the church, and that, pursuant to the order, the German manufacturer forwarded colored sketches, showing the designs of the windows. Following approval of the sketches by the Rudolph Compton Studios, who acted as the agent for the pastor, the windows were manufactured.

The provision for shrines and parts thereof has been the subject of much tariff litigation. As early as 1929, in the case of *C. Wildermann Co.* v. *United States*, 56 Treas. Dec. 572, T.D. 43713, the court had under consideration certain religious statuary illustrating the 14 stations of the cross, covering the period from the time when Christ was condemned to death to the time He was buried. The court found

that the articles inspire members of the church, when in the presence of such articles, "to an attitude and an act of religious devotion" and held the merchandise to be classifiable as shrines. In the course of its decision, the court referred to definitions of the word, "shrine," and stated as follows:

On page 5599 of the Century Dictionary and Cyclopedia a shrine is defined, among other things, as a small chapel or temple, or other sacred object or place peculiarly consecrated to and supposed to be hallowed by the presence of some deity, saint, mythological hero, or other personality reputed sacred. Webster's New International Dictionary denotes a shrine as "a place or object hallowed from its history or association." Murray's New English Dictionary, volume 8, page 799, defines a shrine as "a receptacle containing an object of religious veneration—a niche for sacred images. A place where worship is offered or devotions are paid to a saint or deity." It appears that although a shrine was originally a tomb containing the bones of saints or other sacred person, the meaning of the word has, through the ages, been recognized by the lexicographers to have enlarged in scope so as to embrace a receptacle containing an object of religious veneration, such as a niche for sacred images. It is clear, therefore, that pieces of statuary, having carved therein scenes representing Christ on the way to the Cross, and having as their purpose the creation of religious veneration in man, are shrines.

The *Wildermann* case, *supra*, was cited with approval in *Patrick J. Temple* v. *United States*, 65 Treas. Dec. 1249, Abstract 26784, wherein the court held statuary, representing certain saints and the Pieta, to be shrines, upon a finding that such religious articles, before which special services are frequently held, incite veneration and devotion upon the part of worshipers.

In *The Gasparri Studios* v. *United States*, 33 Cust. Ct. 470, Abstract 58614, the merchandise consisted of a number of pieces of marble and a bronze grille, which, when completely assembled, formed a massive and richly ornamented setting for a painting of the Madonna and Child. The complete unit—painting and imported setting, which included a shield on top bearing the letter "M" for Mary—was installed in the Roman Catholic Church of St. Rosalia in Brooklyn, N.Y., behind and higher than the main altar, and was the focal point for special devotions that were conducted regularly. The court held the integrated unit to be classifiable as a shrine.

Certain ikon prayer stands to which, after importation, an ikon was securely affixed were held to be classifiable under the provision for shrines and parts thereof. *Nicholas J. Stevason* v. *United States*, 32 Cust. Ct. 469, Abstract 58041. The conclusion was based on record evidence, showing that "no church of the Greek Orthodox faith can properly function and perform its services according to the canons of the church without the presence of ikons, which are placed in a position in the church before which all parishioners, upon entry, present themselves and pay proper reverence, and that in their function

and use in that church the prayer stand, such as those in issue, is a necessary and indispensable part of the ikon," citing the *Wildermann* case, *supra.*

The very recent decision of the United States Court of Customs and Patent Appeals in *United States* v. *Greek Orthodox Church of Evangelismos,* 49 C.C.P.A. (Customs) 35, C.A.D. 792 (customs appeal 5075), involved a so-called iconostasis, which was described as "an elaborately adorned structure made of wood, extending clear across the church, but not reaching to the ceiling, and separating the greater part of the altar sanctuary from the rest of the church." One of the functions of the iconostasis is to hold and display icons (holy pictures), which, in accordance with the liturgy of the Greek Orthodox Church, are regarded as sacred and are placed before the congregation as visible aids for worship. In holding the iconostasis to be within the purview of the provision for shrines and parts thereof, the court stated that "we find no difficulty in concluding that each icon with its immediate setting is a shrine within the meaning of the Tariff Act of 1930, and we are unable to see why the structure which holds these sacred pictures should be excluded from the meaning of the word 'shrine' (or part of shrine) merely because it houses eight shrines instead of one."

It will be observed that, in all of the cited cases, the court, sustaining the claimed classification for shrines or parts of shrines, found the merchandise to consist of a religious article or a religious unit, particularly located in a church, for worshipers to pay special reverence, or to incite devotion upon the part of worshipers, through special services that were conducted before the shrine.

The stained glass windows involved herein do not meet such standards. While they are not, as the record discloses, the windows of the building, which is protected from the elements of the weather by plate glass windows, these stained glass windows are the windows of the church, and, as such, they are, by design and construction, conducive toward promoting a spirit of prayer and meditation for parishioners or worshipers. The specific locations of the windows in question serve to emphasize that they do not meet requirements for classification as shrines, under the line of cases heretofore outlined.

The case of *Columbo Co.* v. *United States,* 71 Treas. Dec. 186, T.D. 48794, involved a mosaic, composed of colored glass, that depicted a scene described as "Christ Among the Children." After importation, it was imbedded in the walls of St. John's Church, Jersey City, N.J., so as to form a semicircular picture in a niche in the baptistry of the church. In overruling a claim for classification of the merchandise as a shrine, the court stated that the mosaic accomplished no other purpose than that "of a decoration for the baptistry." One of the stained glass

windows in question was installed in the baptistry; two of them were fitted into the choir loft; and two of them were placed in a small hallway or breezeway. It is fair to say that those stained glass windows, like the mosaic passed upon in the *Columbo* case, do not incite veneration or devotion upon the part of worshipers, but merely add appropriate decorative effect to their locations in the church. As to the six windows which were installed in the walls of the main body of the church, they are neither articles of veneration nor objects associated with any devotions or ceremonies conducted in the church. They may impart to the church the finished effect desirable for a house of worship, but they are not to be dignified as shrines, within the judicial interpretation of the term, "shrine," in the cases hereinabove discussed.

That the stained glass windows under consideration were intended to be substitutes for shrines, as the record herein discloses, does not *ipso facto* make them shrines. As aptly stated by Father Mistretta, in the course of his testimony, "actually, in the building of a church, everything is supposed to inspire devotion," but "not every place or every object intended to inspire devotion is a shrine." (R. 26–27.) The stained glass windows in question are not shrines.

It is appropriate, at this point, to repeat what the Court of Customs and Patent Appeals observed in *United States* v. *Buck's, Inc.*, 47 C.C.P.A. (Customs) 12, C.A.D. 721. In that case, our appellate court, rejecting a claim for classification of certain window niches as parts of altars, stated as follows:

> While it may seem to the benefactors of religious institutions to be a hard judgment to hold that importations intended for presentations to churches should be charged with import duties, the courts must carry out the will of Congress, which has seen fit to enumerate as duty free only a small fraction of the many possible furnishings of churches. See *St. Alban's Episcopal Church* v. *United States*, 22 CCPA 366, T.D. 47387, at page 374.

Since it is our conclusion that the stained glass windows involved herein are not shrines, in the tariff sense of the term, the protest must be, and hereby is, overruled.

Judgment will be rendered accordingly.