NOMURA (AMERICA) CORP.
v.
UNITED STATES.
C.D. 3820; Protest Nos. 65/25517–20538–63 and 65/25516–20539–63.

United States Customs Court,
First Division.
May 7, 1969.

Barnes, Richardson & Colburn, New York City, (James S. O'Kelly and Hadley S. King, New York City, of counsel) for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen., (Sheila N. Ziff and Andrew P. Vance, New York City, trial attorneys), for defendant.

Lamb & Lerch, New York City, (David A. Golden, New York City, of counsel) as amicus curiae.*

Before WATSON, MALETZ, and RE, Judges.

* Granted permission to withdraw as *amicus curiae* subsequent to the trial of this action.

RE, Judge:

The two protests in this case, consolidated for purposes of trial, pertain to merchandise imported from Japan and described on the invoices as "Wader Boots—Chest High." It is made of rubber and consists of steel-shanked rubber boots at the bottom with attached rubber leggings rising to a high waist or chest.

The merchandise was classified by the collector of customs under paragraph 1537(b) of the Tariff Act of 1930, as modified, T.D. 53865, as "[b]oots, shoes, or other footwear, wholly or in chief value of india rubber." Duty was assessed at the rate of 12½ per centum ad valorem on the basis of American selling price appraisement as defined in section 402(e) of the Tariff Act of 1930, and as required by Presidential Proclamation 2027, T.D. 46158.

Plaintiff contends that the importations, referred to as "waders," are not "[b]oots, shoes, or other footwear," within the intendment of paragraph 1537(b), thus requiring the assessment of duty on the basis of American selling price appraisement. Rather, plaintiff asserts that the merchandise is properly classifiable under paragraph 1537(b) *supra*, as "[m]anufactures of india rubber or gutta-percha, * * * [o]ther" at the rate of 12½ per centum ad valorem on a basis of value other than the American selling price appraisement.

The relevant statute, paragraph 1537(b), Tariff Act of 1930, as modified, T.D. 53865, provides in part as follows:

"Manufactures of india rubber or gutta-percha, or of which these substances or either of them is the component material of chief value, not specially provided for (except * * *):

Boots, shoes, or other footwear, wholly or in chief value of india rubber ............. 12½% ad val.

NOTE: The duty on the foregoing articles is to be calculated on the basis specified in T.D. 46158.

Other ............ 12½% ad val."

The plaintiff is a Japanese trading company which, at the time of the importations in 1960 and 1961, was importing footwear from its parent company in Japan. Plaintiff's sole witness, Mr. Sam Garfinkel, testified that he was employed by the plaintiff as a sales manager, and identified plaintiff's illustrative exhibit 1 as an article the same in all material respects as the waders designated on the invoices before the court. Being familiar with the manner of use of the merchandise, he testified that it is used by fishermen "casting in the surf, and going into the surf." (R.8) It was "[u]sed primarily for fishing" and covered the body "[r]ight from the bottom of the feet right up to the chest." (R.8) Mr. Garfinkel had never seen the article used in any other way. Referring to the merchandise imported by the plaintiff at the time of the importations, he testified that "it wasn't only chest high waders. It was everything in the footwear line." (R.9) The defendant called two witnesses, Mr. Robert T. Frazza, a buyer of footwear for all the branch stores of Abercrombie & Fitch, and Mr. Joel K. Wechsler, assistant general manager of the sporting goods division of the Converse Rubber Company. Mr. Frazza testified that in the course of his duties he had bought and worn waders similar to those in question. He stated that the merchandise is part of the "footwear line," is "bought solely in the footwear, shoe department," and is not "sold anywhere other than in the footwear department" of his employer. (R.12) From his total experience in the "footwear line" since 1947, Mr. Frazza testified that the merchandise was sold "by foot size, shoe size," and "is primarily a wading boot." (R.12, 13)

In cross-examination Mr. Frazza testified that the merchandise was a "boot." He was asked whether he agreed with the definition of "boot" found in Web-

ster's New International Dictionary, Second Edition, 1960, as:

> "[a]n article of apparel, usually of leather, for the foot and leg, sometimes reaching only just above the ankle, sometimes to the knee, or especially when made of rubber, to the hip."

The witness would agree with the definition "if it goes higher than the hip." He would not if it stopped at the hip. (R.14) In response to a question by the court, Mr. Frazza also stated that there are some stores that sell this type of merchandise "in the fishing department, or athletic department." (R.15)

Mr. Wechsler testified that the footwear items manufactured by his company consisted of fishing and hunting goods, tennis shoes, basketball shoes and waders. (R.17) His company manufactures a product similar to plaintiff's illustrative exhibit 1 and he is "involved with the sales and distribution of that product." (R.17–18) In a supervisory capacity he has traveled with his salesmen throughout the country visiting footwear buyers. Mr. Wechsler testified that items such as plaintiff's illustrative exhibit 1 "are sold by foot size as waders, as footwear." He repeated: "They are sold by footwear, boot size, as footwear." (R.19) He testified further that he attended both sporting goods trade shows and shoe trade shows, and that the product in question "is usually displayed in a section of the exhibit room along with other waterproof footwear." (R.19) Since the merchandise is advertised as containing pockets and a reinforced crotch, Mr. Wechsler in cross-examination was asked whether this was usual in an article of footwear. The witness replied "[c]ertainly," and listed articles of footwear so advertised as "[a]ll chest waders, all waist high waders * * *." (R.29–30) On redirect examination he testified that the primary purpose of the waders is to protect the foot and the leg. (R.31) In re-cross-examination he added that to keep some of the area above the waist dry, is "a secondary purpose." (R.31)

The question presented in these protests is whether the merchandise at bar, "waders," was properly included in the provision of the Tariff Act of 1930, which reads, "[b]oots, shoes, or other footwear, wholly or in chief value of india rubber." The defendant suggests that the case presents a classic example for the use of the sample as a potent witness, and maintains that the merchandise was correctly classified since waders are footwear, described in the trade and by lexicographic authorities as a form of footwear, to wit, boots. The plaintiff urges that a wader is not a boot since a boot is, by definition, "an article which covers the foot and leg, extending no further than the hip." As stated in its brief, "[c]overing almost the [sic] ¾ of the body, the goods at bar are clearly not boots or footwear." (Plaintiff's brief p. 7)

It is well established that the terms of tariff provisions are used by Congress in their known commercial sense, which, in the absence of evidence to the contrary, is presumed to be the same as their common meaning. Swift & Co., a Corporation v. United States, 27 CCPA 181, C.A.D. 83 (1939). In ascertaining the common meaning of statutory terms the courts are not restricted to the testimony of witnesses but may consult standard lexicographic definitions. See United States v. Brager-Larsen, 36 CCPA 1, C.A.D. 388 (1948); United States v. Tropical Craft Corp., etc., 42 CCPA 223, C.A.D. 598 (1955).

The court has examined all available definitions for the terms "shoes," "boots" and "footwear." Since the parties apparently agree that the imported merchandise is known as "waders," the definitions of "wader" or "waders" have also been examined. Abridged dictionaries generally define "waders" as "high waterproof boots; hip boots," or "high waterproof rubber boots for wading." See Webster's New World Dictionary of the American Language (College Edition, 1964).

Webster's Third New International Dictionary of the English Language Un-

abridged (1968) gives the following meanings for the word "wader":

"1: one that wades 2: WADING BIRD 3a: WADING BOOT, b: a waterproof garment that consists of trousers sometimes reaching to the armpits, has attached socks or waterproof boots or shoes, and is worn (as by anglers or duck hunters) over the regular clothing—often used in plural (a pair of waders)."

These definitions are also to be found in the 1963 edition of Webster's Unabridged Dictionary, and they have been reproduced by the parties in their briefs. Each, of course, relies on different portions of the relevant definition. The plaintiff has emphasized the words "waterproof garment." The defendant has stressed the words "wading boot," which appear in capital letters in both the 1963 and 1968 editions.

Funk & Wagnalls Standard Dictionary of the English Language, International Edition (1966), sets forth the following three meanings for the noun "wader":

"1 one who wades. 2 a long-legged wading bird, as a snipe, plover, or stork. 3 *pl.* high waterproof boots, worn especially by anglers."

The plaintiff contends that "waders" are "in fact, articles of wearing apparel," as distinguished from "shoes, boots, or other footwear." Since an inspection of waders reveals that they are designed to be worn without shoes, defendant points out that there would seem to be little question but that they are "wearing apparel" for the feet. The instructive article on "shoes" in the 1966 edition of the Encyclopaedia Britannica commences with the sentence that "[s]hoes and boots are very ancient items of dress, their value as protective covering in severe climates or rough terrain being obvious." On the subject of construction and design it is therein stated that "[t]he first type of footwear was a simple wrap-around of leather (the basic construction of a moccasin), held together on the foot with rawhide lacings. Gradually this design was improved

upon and assumed many variations." One might well therefore conclude that waders are an improvement or variation of the basic construction designed, however, to fulfill a particular need. From this viewpoint the case is analogous to those where shoe brushes, toothbrushes and carving knives have been varied or improved by the addition of an electric motor. Fred Roberts Co. v. United States, 46 Cust.Ct. 254, C.D. 2265 (1961) (electric shoe brushes); Kaysons Import Corp. v. United States, 56 Cust. Ct. 146, C.D. 2622 (1966) (electric toothbrushes); Household Mfg. Co. v. United States, 62 Cust.Ct., C.D. 3729 (decided Mar. 4, 1969) (electric carving knives).

In the *Household Mfg. Co.* case, recently decided by this court, it was noted that although the articles operated somewhat differently from a hand carving knife, they nevertheless performed "the same *essential* function." *Id.* [Emphasis added.]

In the *Roberts* case, which held that the electric shoe brush was a brush, the court observed:

"* * * It seems clear that the article at bar is used *principally* for the same purpose as the familiar hand-operated shoe-shining brush that consists of bristles or hair set into a wooden or other back. The article before us does not do anything but shine or polish shoes or other objects upon which it is used. It is our view, therefore, that it is nothing more than a brush, albeit electrically operated." 46 Cust.Ct. 254, 255, C.D. 2265 (1961). [Emphasis added.]

The *Kaysons* case, which dealt with electric toothbrushes, is more directly applicable because the plaintiff therein contended that the article was more than a toothbrush since it massaged the gums as well as brushed the teeth. Whether the motion and effect of the electrically operated brush was actually a "massage" was not deemed to be a relevant issue. In holding that "[t]he brush is still a brush," the court said that "[t]he issue is whether the involved articles are

known commonly and in the trade and commerce of the United States as toothbrushes." 56 Cust.Ct. 146, 150, C.D. 2622 (1966). Additionally the court noted:

> "* * * It is evident that the application of electrical operation to small articles in common use, such as various kinds of brushes, is going to make them more complicated in structure. If the buyer gets, for better or for worse, a dose of gum massage with every utilization of the article, that is part of the gain he derives or price he pays for living in 1966. The brush is still a brush." Id. at 152.

This court, in the *Kaysons* case, cited J. E. Bernard & Co.; Inc., et al. v. United States, 52 Cust.Ct. 56, C.D. 2436 (1964), and United States v. L. A. Salomon & Bro., 22 CCPA 490, T.D. 47483 (1935), for the proposition that "Congress legislated for the future and is presumed to have intended to cover all forms of the article, including improved models not known in 1930." 56 Cust.Ct. 146, 150, C.D. 2622 (1966). Clearly the principle is equally pertinent here, and applies to all *eo nomine* terms or articles for which provision is made in the tariff laws.

As stated in Nylos Trading Company v. United States, 37 CCPA 71, 74, C.A. D. 422 (1949), "[a] statutory term may embrace subsequent merchandise whose existence was unknown commercially when the tariff act was enacted."

In the construction of the words "other footwear," plaintiff relies upon the doctrine of *ejusdem generis* and refers to the case of Abercrombie & Fitch Co. v. United States, 7 Cust.Ct. 91, C.D. 541 (1941), which dealt with fur moccasin slippers. In applying the doctrine in that case, the court stated:

> "* * * The enumeration of specific kinds of footwear, i. e., boots and shoes, in paragraph 1530(e) is followed by a general term 'footwear.' The rule requires that the general term be construed as limited to articles of the same species as the particular articles enumerated. We are satisfied that the moccasins at bar are within that category. In form, shape, name, and use they have the attributes of boots and shoes." Id. at 93.

The rule is well known that "general words following particular words apply only to things *ejusdem generis.*" Chegaray v. Mayor of New York, 13 N.Y. 220, 230 (1855). Because of his opinion in The King v. The Trustees for Paving Shrewsbury, 3 Barnewall & Adolphus 216, 110 Eng.Rep. 80 (K.B. 1832), it is sometimes known as Lord Tenderden's Rule. See also Rex v. Wallis, 5 T.R. 375, 101 Eng.Rep. 210 (1793). As stated by the Supreme Court of the United States, however, "while the rule is a well-established and useful one, it is, like other canons of statutory construction, only an aid to the ascertainment of the true meaning of the statute. It is neither final nor exclusive. To ascertain the meaning of the words of a statute, they may be submitted to the test of all appropriate canons of statutory construction, of which the rule of *ejusdem generis* is only one." Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 89, 55 S.Ct. 50, 79 L.Ed. 211 (1934).

The proper application of *ejusdem generis* and the related but broader doctrine of *noscitur a sociis* is demonstrated in the case of X-Acto Crescent Products Co., Inc. v. United States, 27 Cust.Ct. 190, C.D. 1368 (1951). Both doctrines serve only to aid in the construction of statutory terms. See Moore v. City of Mobile, 248 Ala. 436, 28 So.2d 203, 206 (Ala.1946); A. H. Jacobson Co. v. Commercial Union Assur. Co., 83 F.Supp. 674, 678 (U.S.D. C. Minn.1949). *Ejusdem generis* (of the same kind), in essence, states that where general words follow terms designating specific or particular things, persons or subjects, the general words are to be construed as including only those things, persons or subjects which are of the same kind, class or species as those specifically enumerated. *Noscitur a sociis* (associated words) signifies that one may ascertain the meaning of an

ambiguous term by determining the meaning of the other terms with which it is associated. See Morecock v. Hood, 202 N.C. 321, 162 S.E. 730, 731 (1932).

The merchandise in the *X-Acto Crescent Products* case consisted of empty wooden boxes arranged to hold small tools. It was claimed to have been properly dutiable under the provisions for "boxes, crates, fruit-picking trays and similar containers." The defendant therein cited the two doctrines as manifesting an intent to limit the term "boxes" to those similar to crates and fruit-picking trays. Plaintiff, on the other hand, contended that the term "boxes" was an unambiguous *eo nomine* designation which covered every variety of box. In holding that the defendant "misapprehended the scope and application of the rule of *ejusdem generis*," the court stated:

> "The particular things or classes of things which are designated in the provision here in question are 'boxes, crates [and], fruit-picking trays', and the general words are 'similar containers.' The rule might have some application in a proper case to a determination of the meaning of the words 'similar containers,' but it has no application to a determination of the word 'boxes.'" *Id.* at 191.

Similarly here *ejusdem generis* would have no application if the court concludes that the merchandise consists of "boots."

The court in *X-Acto Crescent Products* disposed of the doctrine of *noscitur a sociis* with the following observations:

> "It is to be observed that *before* the rule may be applied, the word or phrase (whose meaning is to be determined by the use of the rule) must be found to be ambiguous or susceptible to more than one meaning. But here such is not the case. The term 'boxes' has a well-understood signification, and includes boxes such as those before us. It is only if the term 'boxes' is read in association with the words which follow it that a doubt may arise as to whether it was used in the tariff

provision in a limited sense—but if this is done the *noscitur* rule would be used to *create* the doubt or ambiguity, and this is not the function of the rule." *Ibid.*

■ Surely citation of authority is not required for the proposition that the courts may resort to rules or canons of construction only when the statutory term or language is in doubt. If the language is plain and unambiguous, as stated by the court in United States v. R.F. Downing & Co., 17 CCPA 194, 196, T.D. 43645 (1929), "we are not permitted to limit its meaning by a sort of judicial legislation."

■■ Plaintiff has placed undue reliance upon the definition of "boot" found in the second edition of Webster's New International Dictionary, which concludes by stating "especially when made of rubber, to the hip." For tariff classification purposes, hip length offers no talismanic solution to the number and variety of items encompassed by the *eo nomine* designation "boots." The relevant cases illustrate with abundant clarity that tariff terms descriptive of an article will embrace all improved models or versions of the original article. As shown by the cases that dealt with the addition of an electric motor to the basic article, the question is whether the article *essentially* or *principally* performs the same function. It is in this sense that the witnesses for the defendant referred to the "primary" and "secondary" purposes of the waders. (R.13, 31) The "primary purpose is to protect the foot and the leg"; to protect the area above the waist "is a secondary purpose." (R.31) The waders, therefore, perform *essentially* the function of boots even though they may also protect other parts of the body.

This aspect of the case is amply demonstrated by Astra Trading Corp. v. United States, 56 Cust.Ct. 555, C.D. 2703 (1966), where this court held that a screwdriver with an illuminating feature, and invoiced as a "flashlight tool," was nevertheless to be classified under

542

the *eo nomine* provision for screwdrivers. In the language of the court:

"* * * We do not believe that the additional feature of illumination transforms the basic purpose of the imported article from use as a screwdriver into some other use; nor do we believe that the illuminating feature gives the article a use in addition to its intended use as a screwdriver. For, illumination notwithstanding, the article remains essentially a device restricted to the use of turning screws, i. e., a screwdriver." *Id.* at 561.

Significantly the court added:

"* * * Our decision also is influenced by the well-established principle that, in determining classification, an *eo nomine* designation must, unless a contrary legislative intent clearly is indicated, be preferred to terms of general description and to enumerations which are broader in scope and less specific." *Ibid.* United States v. Astra Trading Corp., 44 CCPA 8, 11, C.A.D. 627 (1956).

█ The merchandise here is "primarily a wading boot" (R.13), or as referred to in the official papers received in evidence as an unmarked exhibit, "wader boots." Although characterized by a distinctive name, it is no less a form of "boot" or "boots" within the intendment of the tariff laws. There can be no doubt of the applicability of the rule that an *eo nomine* statutory designation of an article, without limitation or contrary legislative intent, judicial decision, or administrative practice, includes all forms of the article. Astra Trading Corp. v. United States, 56 Cust.Ct. 555, 561, C.D. 2703 (1966); Nootka Packing Co. et al. v. United States, 22 CCPA 464, 470, T.D. 47464 (1935).

█ In view of the foregoing, the court concludes that the imported merchandise, invoiced as "Wader Boots—Chest High," was properly classified under paragraph 1537(b) of the Tariff Act of 1930, as modified by T.D. 53865 as

"[b]oots, shoes, or other footwear, wholly or in chief value of india rubber."

█ The aforementioned reasoning makes unnecessary a consideration of those cases cited by plaintiff to illustrate that not every article designed to be worn on the foot is necessarily classifiable as "footwear." United States v. Kahn & Co., 13 CCPA 57, T.D. 40881 (1925) (baby "bootees"); W. J. Byrnes & Co. of New York, Inc., et al. v. United States, 38 Cust.Ct. 339, C.D. 1884 (1957) (paper slippers). It may nevertheless be added that the testimony in this case reveals clearly that waders are part of the "footwear line" and are merchandised as footwear. Although it is true that the merchandise medium through which articles are sold is not always determinative of their classification, there can be no doubt that the manner in which a merchant displays goods may have important probative value on the question of their tariff classification. See United States v. Ignaz Strauss & Co., 37 CCPA 32, 35, C.A.D. 415 (1949); The Spesco Corporation v. United States, 62 Cust.Ct., C.D. 3749 (1969); New York Merchandise Co., Inc. v. United States, 62 Cust.Ct., C.D. 3671 (1969); Davis Products, Inc., et al. v. United States, 59 Cust.Ct. 226, C.D. 3127 (1967).

█ As in all other cases involving a protest of the collector's classification, there is a presumption that the classification is correct. F.H. Kaysing v. United States, 49 CCPA 69, 71, C.A.D. 798 (1962). The plaintiff bears the burden of establishing that the classification is erroneous and that the claimed classification is correct. Novelty Import Co., Inc. v. United States, 53 CCPA 28, 33, C.A.D. 872 (1966); United States v. Victoria Gin Co., Inc., et al., 48 CCPA 33, 35, C.A.D. 759 (1960); United States v. Gardel Industries, 33 CCPA 118, 121, C.A.D. 325 (1946).

The plaintiff has not sustained this burden and the protests are therefore overruled. Judgment will be entered accordingly.