(C.D. 4799)

PISTORINO & COMPANY, INC. *v.* UNITED STATES

---

[3] *United States* v. *Aceto Chemical Co., Inc.*, 64 CCPA 78, C.A.D. 1186, 553 F. 2d 685 (1977); *United States* v. *Cavalier Shipping Co., Inc.*, 60 CCPA 152, C.A.D. 1103 (1973).

Court No. 73-9-02584

(Decided April 20, 1979)

*Doherty and Melahn* (*Walter E. Doherty, Jr.,* of counsel) for the plaintiff.
*Barbara Allen Babcock,* Assistant Attorney General (*Mark K. Neville, Jr.,* trial attorney), for the defendant.

RE, Chief Judge: The legal question presented in this case pertains to the proper classification, for Customs duty purposes, of certain

bronze carvings imported from Italy. These carvings, called "pinnacles," were approximately 5 to 12 feet in length, and after importation were assembled to form a crown approximately 28 feet wide and 120 feet around. The crown was then placed or affixed as the top of a tower in a building complex in East Boston, Mass., known as the Madonna Queen National Shrine. On one facade of the tower, and below the crown, is a statue of Mary, the Mother of Christ, referred to as the Madonna, Queen of the Universe.

The bronze pinnacles were classified by the customs officials under item 657.35 of the Tariff Schedules of the United States [TSUS], as modified by T.D. 68–9, as "[a]rticles of copper, not coated or plated with precious metal: * * * Other." Consequently, they were assessed with duty at 0.6 cent per pound plus 7.5 per centum ad valorem.

Plaintiff protests that classification, and claims that the importation is properly classifiable under item 850.70 of the tariff schedules which covers "shrines" and "parts, appurtenances, or adjuncts" of shrines. If the imported pinnacles are properly classifiable under the claimed provision, they are entitled to be admitted free of duty.

The pertinent items of the tariff schedules provide as follows:

*As classified:*
"Articles of copper, not coated or plated
with precious metal:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

657.35      Other_____0.6¢ per lb. +
7.5% ad val."

*As claimed:*
"Articles imported for the use of an institution organized and operated for religious purposes, including cemeteries, schools, hospitals, orphanages, and similar nonprofit activities staffed and controlled by such institutions:
850.70          Altars, pulpits, communion tables, baptismal fonts, shrines, mosaics, iconostases, or parts, appurtenances, or adjuncts of any of the foregoing, whether to be physically joined thereto or not, and statuary * * * _____      Free"

Under item 850.70 of the tariff schedules, "parts, appurtenances, or adjuncts" of a shrine need not be "physically joined thereto." Plaintiff does not allege that the importation is a part. It does, however, contend that it is an appurtenance or adjunct of a shrine.

Since the imported merchandise is used by a nonprofit religious institution within the intendment of item 850.70, it is plaintiff's contention that it should be classified under item 850.70, and therefore enter duty free.

On the question of plaintiff's status the parties have stipulated that the importer, the Sons of Divine Providence, Inc., of Massachusetts, is an institution organized and operated for religious purposes, and that the Don Orione Rest Home is a nursing home staffed, operated, and controlled by this institution. The priests who are members of this religious order are known as the Don Orione Fathers. Although the defendant would not stipulate that the importer is a nonprofit organization, it offered no evidence to refute the testimony of Father Rocco Crescenzi, administrator of the home since 1952, that it is a nonprofit organization operated solely for religious and charitable purposes.

From the uncontradicted and reliable testimony of record, it is the determination of the court that the Sons of Divine Providence, Inc., of Massachusetts, qualifies as an institution entitled to duty-free entry under item 850.70 of the tariff schedules for the articles of merchandise enumerated in that provision.

The record and numerous exhibits submitted at the trial attest to the unique nature and character of the statue, the Madonna, Queen of the Universe. Plaintiff's contention that the statue is a shrine, or, in the alternative, that the building complex is a shrine, is best understood in relation to their history.

It is agreed that the statue of the Madonna is the focal point of the Madonna Queen National Shrine. Architectural plans for the building complex reveal that the Madonna Queen National Shrine, when fully completed, will consist of a tower, a plaza at street level, an underground church, and a subbasement chapel. The tower contains a total of six floor levels, three of which contain chapels dedicated to one of the three mysteries of the rosary. The top level of the tower contains a hall which also serves as an observation area. It is this hall-observation area which has, surrounding its roof, the pinnacles which were constructed to form the crown above the statue located below.

The statue, the Madonna, Queen of the Universe, is 35 feet high. It was moved to its present location on the north outer wall of the tower shortly before October 7, 1977, after the trial of this action. Prior to its removal the Madonna statue had been located, since 1954, directly across the street, and in front of the Don Orione Rest Home. The testimony of Father Crescenzi indicated that during all of this time votive candles had been lit before it, both day and night. Weather permitting, religious services and devotions were conducted at the statue daily, and more often on Sundays. Father Crescenzi's testimony not only attests to the fervent devotion of the faithful for the Madonna statue, but also that the devotion was a constant and continuing practice.

In its present position at the north facade of the tower, the Madonna statue is 176 feet above the ground. It faces a plaza known as "Pilgrims' Square," which has been described as an area most appropriate for outdoor religious services and ceremonies. This area, in front of the north wall, consists of a platform with an altar at the base. The Madonna statue is above and behind the altar. The crown, consisting of the imported bronze pinnacles, surmounts the tower directly above the Madonna. About 5 to 10 feet separate the head of the Madonna and the crown.

Beneath the plaza will be a large church for which a retaining wall has already been erected. This church will extend below both the tower and the plaza. When completed, it will be used for public religious services and devotions, and will be named the Madonna Queen Church.

During the trial, at plaintiff's request, and in the presence of counsel for the parties and their witnesses, the court viewed the statue in front of the Don Orione Rest Home prior to its transfer to the tower wall across the street. A photograph of the statue, with a large quantity of votive candles at its base, situated in front of the Don Orione Rest Home site, is reproduced as appendix "A."

From this examination of the site, the testimony, and the exhibits produced at trial, there is no doubt that the statue displayed before the Don Orione Rest Home was the object of special veneration. The special nature of the devotions conducted there had meaning only because of the existence of the statue of the Madonna, Queen of the Universe. That these devotions took place solely because of the presence of the statue is obvious because there was no parish or church which drew the faithful to that site, regularly and in large numbers. It was clearly the statue which not only inspired the devotions conducted there, but also was the object of the homage rendered by the votive candles and the prayers of the viewers.

The overwhelming and uncontradicted evidence reveals clearly that the statue conforms to the definition of the term "shrine," as used in the tariff laws of the United States. *Acme Marble & Granite Company* v. *United States*, 324 F. Supp. 503, 66 Cust. Ct. 172 (1971). In the *Acme* case, the question presented was whether a 10-foot high Carrara marble bas-relief plaque depicting the resurrection of Christ, and installed on the outside front wall of a mausoleum, was a "shrine" under paragraph 1774 of the Tariff Act of 1930, as amended, or marble wholly or partly manufactured as classified. The court held that the bas-relief was not a shrine for tariff purposes since it was not the object of special veneration. After an exhaustive review of the pertinent cases on the subject of shrines, the court stated:

> The record is clear that, apart from any funeral or commitment service held at the mausoleum in St. Mary Magdalen Cemetery,

the plaque was neither the scene nor the object of any religious ceremony. * * *

* * * Rather than the object of devotion for its own sake * * * the plaque was merely an aid in the solemnity or veneration inspired by the funeral or memorial mass. 324 F. Supp. at 510.

From a reexamination of those cases and the record here, the court concludes that the statue of the Madonna, Queen of the Universe, in its prior location at the Don Orione Rest Home, was a shrine for tariff purposes.

The uncontroverted statements of the witnesses and the exhibits show clearly that the statue was revered as a special object of veneration for more than 20 years. Since its arrival from Milan, Italy, in May 1954, a Marian year of the Roman Catholic Church, worshipers always burned candles and placed flowers before the Madonna statue. Together with daily pious devotions, this homage was uninterrupted, and a matter of common knowledge.

The statue of the Madonna did not merely inspire devotion, but was the very object of the devotion displayed before it. This is evident because there was no reason to light candles or conduct religious services and devotions outside the Don Orione Rest Home except for the existence or presence of the statue. The faithful came for no reason other than to view it, and pay special homage. It was not necessary that a mass, the highest form of worship in the Catholic liturgy, be conducted in order to inspire persons to pray before the statue. Indeed, on many occasions throngs joined in Marian processions honoring the Madonna Queen. In short, the Madonna statue had an individuality of its own, and was an object of special veneration and devotion.

Illustrative of this veneration is the "Annual Children's Sunday" at which occasion the children are placed at the feet of the Madonna, under whose patronage they receive a special blessing. A ceremony called "Blessing of the Sick" is also held annually before the Madonna who, it is believed by those present, "grants many spiritual graces to those who call on her for aid." As indicated by plaintiff's collective exihibit 7, worshipers have sent letters of thanksgiving and offerings "to the Madonna Queen" for favors received. The record compels the conclusion that the Madonna statue is a shrine in the tariff meaning of the term.

Plaintiff's claim, however, does not pertain to the classification of the Madonna statue, but rather to the pinnacles, which form its crown. Plaintiff contends that the crown constitutes an appurtenance or adjunct of a shrine. Although the court deems the statue to be a shrine, as it stood outside the Don Orione Rest Home, the crown did not come into being until after the statue was removed to the tower wall across the street from the home. The crown, therefore, could not be considered an appurtenance or adjunct of the Madonna shrine while the statue

remained at the home. It could only be an appurtenance or adjunct of the statue at the present location at the tower wall. Hence, further testimony was submitted at a continuance of the trial to assure that the statue would, in fact, be placed at the tower wall under the crown which already had been constructed. The court has duly noted the stipulation filed by the parties that the Madonna statue, in confirmation of that testimony, was enshrined during ceremonies in October 1977 at the tower wall of the building called the Madonna Queen National Shrine.

For the court to conclude, as plaintiff urges, that the crown is an appurtenance or adjunct of a shrine, it is necessary that the statue also be a shrine in its new setting or location. The testimony reveals that the Madonna statue required no particular setting for the homage it received. Thus, it would obviously require none in its new location, be it the building complex, the tower wall, or any other place at the Madonna Queen National Shrine. Its special relationship with the Don Orione Fathers for many years, however, explains its former and present settings. Nonetheless, as a shrine, with an individuality of its own, it requires no particular setting to be the object of devotion and veneration. The overwhelming history of devotion to the Madonna statue leads this court to conclude that the statue, on the former and present sites, constitutes a shrine within the tariff laws of the United States.

Plaintiff's collective exhibit 7 reveals that devotion and veneration to shrines in honor of the Blessed Mother is not new in America. It is evident that "a loyal and loving devotion to our Lady has been, from the very beginning, an important part of American Catholicism." It is also evident from the exhibits submitted at trial that the new setting, admittedly more dignified and attractive, may become one of the great Marian shrines in this country, manifesting the special place that has been accorded the Madonna statue. Indeed, the parties agree that it is the focal point of the Madonna Queen National Shrine, not only because it is prominently displayed, but because of its special relationship to the entire building complex which bears its name. It is apparent from the exhibits that a grandiose complex was contemplated for many years in which the Madonna would be enthroned on a pedestal befitting her portrayal as a Queen. Reproduced as appendix "B" is a photograph of the pinnacles of the crown assembled together at the top of the tower, and, as appendix "C," a sketch of Pilgrims' Square with the Madonna statue enthroned in its tower.

At the Don Orione Rest Home, on a temporary basis, the Madonna statue rested on a wooden platform. However, it was always the intention to place the statue at the tower where a larger number of worshipers could continue the devotions. The move, therefore, was not only to fulfill the hopes and plans of those who conceived the

Madonna Queen National Shrine, but also an expression of devotion to Mary, the mother of Christ.

The crown, formed by the pinnacles, according to the plans for the tower and the testimony, is an essential part of the design. Atop the historical hill of East Boston, the statue is intended to be an exact replica, except for the crown, of the Madonna which stands on Monte Mario, the tallest hill of Rome. That statue was erected through the efforts of "The Friends of Don Orione," in thanksgiving for the sparing of Rome from the physical ravages of battle during World War II. With its unique background, as recited in plaintiff's exhibit 7, and the special treatment it has received since its arrival in the United States, it cannot be questioned that the Madonna statue is not an ordinary religious statue, but is unique among statues. Even before its exportation from Milan, Italy, the statue was the object of a spontaneous display of devotion which delayed its arrival in this country.

Defendant indicates that since devotions have not been shown to take place before the Madonna statue at its new location, the crown could not be an appurtenance or adjunct of the statue-shrine. In view of the record, however, it is impossible to conclude that the statue's transfer to the loftier position of the tower has changed its character in any way. From the testimony, and the physical inspection of both the old and new locations, the only inference that can be drawn is that the Madonna statue has been, and continues to be, a special object of devotion and veneration. Indeed, the very purpose of its transfer to a specially designed place on the facade of the tower was to elevate and exalt the statue as the focal point of the Madonna Queen National Shrine. In this even more suitable setting it was also possible to provide the statue with a crown which it did not have before.

In the tariff sense, it is the essence of a shrine that the article, in and of itself, inspire and be the cause of the devotion paid to it. Its classification as a shrine is not necessarily dependent on its location in relation to a building. It is the holding of the court, therefore, that the Madonna, Queen of the Universe statue is a shrine at the tower wall of the Madonna Queen National Shrine.

The defendant, however, has challenged the requirement that an article, to constitute a shrine within the meaning of the tariff laws, need only inspire or incite the veneration paid to it. It claims that size and location are also crucial to its classification.

As in the *Acme* case, the classification question presented is whether the importation constitutes a shrine not from an "ecclesiastical point of view, or from the personal point of view of one or more laymen, but rather whether * * * [it] is a shrine within the meaning of the tariff laws." The *Acme* case made it clear that the meaning of ecclesiastical terms should be ascertained no differently than other terms whether religious or secular. Furthermore, it is well established in customs law

that the common meaning of a term used in the tariff laws is a question of law to be determined by the court. See *Borneo Sumatra Trading Co., Inc.* v. *United States*, 311 F. Supp. 326, 329, 64 Cust. Ct. 185, 188 (1970).

In its search to ascertain congressional intent the court may rely not only upon expert testimony, but may also examine lexicographic and other standard authorities to aid in its formulation of a definition. The "New Catholic Encyclopedia" recognizes four types of shrines "according as they honor objects of our Lord's Passion, the Blessed Virgin Mary, the saints, or Catholic beliefs and devotions." It also states that "[t]he term shrine refers to a place, usually the object of pilgrimages, where a miraculous statue or picture or other holy object receives special veneration * * * ." "XIII New Catholic Encyclopedia," 181–82 (1967).

On the meaning of the term "shrine," the court heard the testimony of two members of the Roman Catholic clergy, one a witness for the plaintiff and one for the defendant. Father Rocco Crescenzi, the witness for the plaintiff, was ordained in 1943, and has been associated with the Don Orione Rest Home since 1949. From 1964 to 1970 he served as Provincial for the Don Orione Institutions, an assignment in which he supervised seven institutions, all of which were engaged in charitable works. His concept of a shrine is "more than a regular church. It is a place of devotion where people go more willingly for devotion."

Defendant's witness, Rev. Theodore M. Steeman, is an associate professor in the theology department of Boston College. He testified that a shrine may be understood in two senses. In its narrow sense, which he stated governs its true meaning, a shrine is "a smaller object, a kind of container or box that is used to conserve or exhibit relics and other religious objects for religious purposes." He defined shrines in the broader sense as consisting of "churches or even larger religious establishments that have a particular devotional purpose usually not linked to a parish, but that are justified, basically, in terms of the specificity of the devotion that is acted out in those places."

Reverend Steeman conceded that the Madonna Queen National Shrine, upon completion, would be a shrine in the broad sense of that term if devotions were shown to take place there. Nevertheless, he stated that the distinction between the broad and narrow concepts of the term "shrine" was important because, in his opinion, the tariff laws had adopted the narrow concept since the articles listed in item 850.70 of the tariff schedules are small and movable.

The defendant contends that there are three definitions of the term "shrine," at least two of which are possible within the meaning of item 850.70 TSUS. Relying on lexicographic authority, the testimony

of Reverend Steeman, and the doctrine of *noscitur a sociis*, the defendant favors an intermediate interpretation of the broad and narrow meanings. Thus, it suggests that a shrine is "an object that is considered sacred by a religious group and that serves as the focus of the performance of some ritual." In addition, defendant contends that the tariff laws require that it be a small object capable of placement within a building, since the term "shrines" is listed with small articles, i.e., altars, pulpits, baptismal fonts, all capable of placement within a building. For this interpretation, the defendant relies heavily on the doctrine of *noscitur a sociis* which teaches that one may ascertain the meaning of an ambiguous term by the meaning of the other terms with which it is associated. See *Nomura (America) Corp.* v. *United States*, 62 Cust. Ct. 524, 299 F. Supp. 535 (1969), *aff'd*, 58 CCPA 82, 435 F. 2d 1319 (1971).

The defendant also cites legislative history to support its contention that any article which cannot be placed within a building is ineligible for classification as a shrine. It maintains that since the House Committee on Ways and Means, as well as the Senate Finance Committee, used the word "article" throughout their reports, Congress could not have intended it to include a building complex or a locus within the provisions of item 850.70. Suffice it to say that the term "article," in the tariff schedule sense, simply means "importation" or "merchandise," and in no way resolves the classification question presented.

By including "shrines" in item 850.70 Congress sought to accord shrines the same duty-free treatment given altars, pulpits, communion tables, baptismal fonts, mosaics, and iconostases. It did not, in any way, specify or limit the number or kind of shrines just as it did not qualify altars, pulpits, communion tables, baptismal fonts, mosaics, or iconostases. As stated in *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, 470, T.D. 47464 (1935): "an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article." It should also be noted that because "statuary" is included in item 850.70 does not mean that statues are excluded from the category of shrines. Clearly, not all statues are shrines, and many shrines are not statues.

What must be determined is whether the pinnacles, which constitute the crown of the Madonna statue, are "appurtenances or adjuncts" of a shrine. The common element for the classification of the articles enumerated in item 850.70 is that they are imported for the use of a religious institution. The statutory provision makes no reference to size or location. As for size, altars, pulpits, and baptismal fonts are almost always large items, while mosaics, iconostases, and statuary

may vary in size, as well as in location. Moreover, altars, pulpits and baptismal fonts are not necessarily movable, and, once in place, are usually fixed.

The term "shrines," therefore, in item 850.70, cannot be limited as to size, location, or even portability. The articles enumerated all share the common element of a religious or spiritual meaning. The court, therefore, does not agree with defendant's contention that an article, to fall within the ambit of item 850.70 of the tariff schedules, need necessarily be "small," or be located in any particular place.

A study of the cases examined in *Acme* indicates that neither size nor location was determinative in deciding whether the imported article was a shrine for tariff purposes. The case of *Patrick J. Temple v. United States*, 65 Treas. Dec. 1249, Abs. 26784 (1934), decided under paragraph 1774 of the Tariff Act of 1930, held that plaster-of-paris images of several saints, and a statue of the "Pietà," placed in the basement of a Catholic mission, were shrines because they inspired veneration, and were the objects of "special devotional services." In *C. Wildermann Co. v. United States*, 56 Treas. Dec. 572, T.D. 43713 (1929), Stations of the Cross were also held to be shrines under paragraph 1674 of the Tariff Act of 1922, although they were outdoors, and not physically present in a religious edifice.

A leading case is *Daprato Statuary Co. v. United States*, 16 Ct. Cust. Appls. 233, T.D. 42840 (1928), which dealt with paragraph 1674 of the Tariff Act of 1922, the predecessor provision to paragraph 1774 of the Tariff Act of 1930. The Court of Customs Appeals affirmed a holding of this court which held that a marble, mosaic floor of a church, upon which rested an altar and two shrines, was not part of an altar or "shrine." It defined the term "shrine" as signifying "either a chapel dedicated to some holy personage or a thing, receptacle, case, tomb, or altar made venerable by some historic event or sacred association." It also noted that "[a]ltars and shrines * * * have an individuality of their own * * *." 16 Ct. Cust. Appls. at 235.

Although the defendant concedes that the courts have broadened the definition of shrine since the *Daprato* case, it nevertheless cites that case for the proposition that Congress intended the terms "shrine" and "altar" to be used in a restricted and religious sense, and that it did not intend to exempt from duty churches, chapels or buildings dedicated to religious uses. The defendant also questions the extent to which Congress has ratified later decisions in which the courts have broadened the definition of shrines.

The present governing tariff provision is item 850.70 of the tariff schedules. The predecessor provision covering shrines, and parts of shrines, paragraph 1774 of the Tariff Act of 1930, was the subject of comment by the Court of Customs and Patent Appeals in *United States v. Greek Orthodox Church of Evangelismos*, 49 CCPA 35, C.A.D.

792 (1962). In that case, the appellate court affirmed this court's decision which held that an iconostasis, containing several panels of icons (holy pictures), was a shrine since the pictures were regarded as sacred and venerated. The following portion of the opinion of the Court of Customs and Patent Appeals is pertinent:

> Turning to the legislative history, the term in question appeared in the Tariff Act of 1922, paragraph 1674, and, at a time when that act was in force, in *C. Wildermann Co.* v. *United States*, 56 Treas. Dec. 572, T.D. 43713, the Customs Court said: "It appears that although a shrine was originally a tomb containing the bones of saints or other sacred person, the meaning of the word has, through the ages, been recognized by the lexicographers to have enlarged in scope so as to embrace a receptacle containing an object of religious veneration, such as a *niche for sacred images*." [Italic supplied.] This decision was presumably known to Congress when it reenacted, as paragraph 1774 of the Act of 1930, the same language which had been construed by the Customs Court. The authorities are not entirely uniform upon the point, but this court has held that, although the reenactment of the statute after a judicial interpretation by a court which is not a court of last resort "may not be a controlling consideration, it is a matter we think proper to consider along with" other matters. *Oxford University Press, N.Y., Inc.* v. *United States*, 33 CCPA 11, 22, C.A.D. 309.
>
> Since the passage of the 1930 act, the Customs Court in a consistent series of decisions has construed the words "shrine or parts of shrines" broadly enough to cover the present case. * * * Even if there were no evidence afforded by the legislative history, we would hesitate to overrule a line of cases that has extended over 30 years though not the decisions of a court of last resort. 49 CCPA at 39.

The cases referred to by the Court of Customs and Patent Appeals in the *Greek Orthodox Church* case were reviewed by this court in the *Acme* case. The defendant, however, has neither discussed nor cited the *Acme* case which contains the more recent treatment by this court on the subject of shrines.

The cases relied upon by this court in *Acme* reveal that the courts have interpreted the term "shrine" liberally, following the policy articulated by the Supreme Court in *Benziger* v. *United States*, 192 U.S. 38 (1904), as to articles imported solely for religious purposes. In *Benziger*, the question presented was whether the omission from paragraph 638 of the Tariff Act of 1897 of the words "casts of marble, bronze, alabaster, or plaster of paris," which appeared in prior tariff acts, prevented the free entry of such casts as "casts of sculpture" under paragraph 649 of the 1897 act. After examining the various provisions in the tariff statutes from 1861 to 1897, as they pertained to casts of sculpture, the Supreme Court said:

> This provision of the statute should be liberally construed in favor of the importer, and if there were any fair doubt as to the

true construction of the provision in question the courts should resolve the doubt in his favor. 192 U.S. at 55.

No opinion since *Acme* has been cited by the defendant in which this court, or the Court of Customs and Patent Appeals, has departed from the broadened interpretation given to the term "shrine." Thus, what was said by the Court of Customs and Patent Appeals in *United States* v. *Greek Orthodox Church of Evangelismos* as to the 1930 provision for shrines is equally true today as to item 850.70 of the tariff schedules.

It should be noted that in the cases reviewed in *Acme*, in which the articles were held not to be shrines or parts of shrines, the court was not concerned with whether they were located inside or outside a building, but rather, whether they were special objects of veneration. Indeed, the holding in *Acme*, that the marble bas-relief plaque installed in the outside wall of a mausoleum was not a shrine, was not based on the fact that the plaque was large and located outdoors. It was held not to be a shrine because it was not the object of special veneration. See also *Daprato Statuary Co.* v. *United States*, 16 Ct. Cust. Appls. 233, T.D. 42840 (1928) [mosaic floor of a church held not part of a shrine]; *Columbo Co.* v. *United States*, 71 Treas. Dec. 186, T.D. 48794 (1937) [mosaic of colored glass held not a shrine]; *Lea's* v. *United States*, 41 Cust. Ct. 4, C.D. 2012 (1958) [majolica tiles held not parts of shrines]; *Westfeldt Brothers* v. *United States*, 48 Cust. Ct. 125, C.D. 2323 (1962) [stained glass windows held not shrines]; *John Horvath Company* v. *United States*, 274 F. Supp. 986, 59 Cust. Ct. 397 (1967) [mysteries of the rosary plaques held not shrines].

The *Wildermann* case, 56 Treas. Dec. 572, T.D. 43713 (1929), an early case in which outdoor Stations of the Cross were held to be shrines, is still pertinent, and refutes the defendant's contention that a shrine must be located indoors:

> Congress in providing *eo nomine* for shrines in paragraph 1674 * * * [succeeded by paragraph 1774 of the Tariff Act of 1930 and item 850.70 of the tariff schedules] did not provide either expressly or by implication where such articles should be used, and under the rules of construction in cases of this kind all forms of the article mentioned in the paragraph of the law are included therein * * *. 56 Treas. Dec. at 575.

The defendant cannot restrict the fundamental principle of Customs law governing the interpretation of an *eo nomine* provision referred to in the quotation from *Wildermann*, namely, that "in cases of this kind all forms of the article mentioned in the paragraph of the law are included therein."

Notwithstanding the testimony on the various meanings of the term "shrine," the determination of what constitutes a shrine for tariff purposes is a question for the court to decide. Some of the testimony

of the defendant's witness is clearly contradictory of existing law. On the legal meaning of the term "shrine," it is unduly restrictive, and is of value only as to the etymological definition of the term. Indeed, under the restrictive meaning suggested by defendant, some of the articles or importations already held to be shrines by the courts would not qualify for duty-free entry pursuant to the tariff laws.

It is the determination of the court that the statue of the Madonna, Queen of the Universe, at the tower wall of the Madonna Queen National Shrine is a shrine for tariff purposes. The Madonna statue, as an outdoor statue-shrine, is no different than the outdoor Stations of the Cross shrine in the *Wildermann* case, and the Pietà statue in the *Temple* case. All share in common the essential element that they are special objects of veneration.

Although the transfer of the Madonna, Queen of the Universe statue did not change its character as a shrine, its removal to the tower is important on the question whether the pinnacles, placed over its head as a crown, are "appurtenances or adjuncts" of a shrine.

Item 850.70 of the tariff schedules expressly includes:

> * * * shrines * * * or parts, appurtenances, or adjuncts of any of the foregoing, whether to be physically joined thereto or not * * *.

Item 850.70 reflects an amendment made in 1962 to its predecessor provision, paragraph 1774 of the Tariff Act of 1930, by H.R. 4449, Public Law 87–604. Senate Report No. 1719, which accompanied H.R. 4449, makes the following explanation:

> The word "parts" contained in the present provisions of paragraph 1774 has been interpreted by the courts to refer to structural parts to be physically joined to the articles of which they are a part. Difficult interpretative questions have arisen in respect to present provisions in this respect. It is, of course, the intent of the Finance Committee in reporting this bill that general construction materials are not to be included, as the bill applies only to structural parts essential to the article in question.
>
> A second purpose of the bill is to provide that articles which are appurtenances or adjuncts of the named articles, as well as parts thereof, shall be accorded the free entry privilege *whether to be joined thereto or not*, when imported under the conditions specified. Thus, articles concerning which interpretative questions have arisen, such as baldachinos, reredoses, tabernacles, altar predellas, altar cloths, and altar candlesticks, which are not actually physically attached to, or are structural parts of altars, pulpits, communion tables, and other religious articles named in paragraph 1774, would be within the purview of the bill. Candles and similar items not specially prepared for use with altars, shrines, etc., and which find other uses, would not be included. [Italic added.]

It is clear from the statutory language that the articles, to qualify for the free-entry privilege, may be either parts, appurtenances, or

adjuncts of shrines. Hence, articles are embraced in tariff item 850.70 which includes shrines if they are "appurtenances or adjuncts" of shrines whether or not they are "parts." While plaintiff does not maintain that the pinnacles are parts of a shrine, it does contend that they are appurtenances or adjuncts of a shrine, namely, the Madonna, Queen of the Universe statue.

The following are the definitions of the terms "appurtenance," "appurtenances," "appurtenant," and "adjunct":

> Appurtenance: "That which belongs to something else; an adjunct; an appendage; * * *." "Black's Law Dictionary" 133 (revised fourth ed. 1968)
> Appurtenances: "Accessory objects used in any function * * *." "Webster's Third New International Dictionary" (1968)
> Appurtenant: "Belonging, appropriate, accessory * * *." "Webster's Third New International Dictionary" (1968)
> Adjunct: "Something joined or added to another thing but not essentially a part of it * * *." "Webster's Third New International Dictionary" (1968)

Thus, the terms "appurtenance" and "adjunct" appear to be synonymous, and describe articles which belong, pertain, or relate to another article.

While the imported pinnacles, in the form of a crown, are not joined physically to the Madonna, Queen of the Universe statue, there is an unquestioned belonging, pertinence, or relationship between the statue and the crown. A crown is the traditional headdress of a queen, and is the mark of a sovereign. The testimony, exhibits, and inspection reveal a physical, artistic, and symbolic relationship between crown and statue.

The 5 to 10 feet between the head of the statue and the crown neither affect the concept, nor detract from the aesthetic appeal of the crown. Though not physically joined to the statue, it is physically joined to the tower which conceptually and functionally serves as a throne for the statue. Nevertheless, item 850.70 expressly provides that apurtenances or adjuncts, as well as parts, need not be physically joined to the articles enumerated. On the particular record before the court the bronze pinnacles, which constitute the crown, are appurtenances or adjuncts of the shrine, the Madonna, Queen of the Universe statue.

In its brief, the defendant has also contended that the imported merchandise cannot be classified under item 850.70 as a part, appurtenance, or adjunct since the statue and the imported merchandise were "not positioned in any arguable contact with one another for over 5½ years after the importation of the 'crown.' " Defendant relies upon general interpretative rule 10(e)(ii) which states that:

> A tariff classification controlled by the actual use to which an imported article is put in the United States is satisfied only if

such use is intended at the time of importation, the article is so used, and proof thereof is furnished within 3 years after the date the article is entered.

Since item 850.70 is not "a tariff classification controlled by the actual use," defendant's contention is without merit. The articles imported, in order to qualify for duty-free status, must be "imported for the use of an institution organized and operated for religious purposes." That requirement, however, does not pertain to the actual use or purpose of the articles, but only as to the class or type of institution that may use the importation. Item 850.70 does not speak of use within the intendment of general interpretative rule 10(e)(ii), but simply enumerates certain articles. In the language of customs law, item 850.70 is an *eo nomine* provision, i.e., one which describes an article of merchandise by specific name, and is not a classification provision which depends on actual use. See, e.g., the *Wildermann* case, which stated categorically that Congress provided *eo nomine* for shrines. 56 Treas. Dec. at 575. The question is whether the pinnacles constitute "appurtenances or adjuncts" of any one of the articles named in that *eo nomine* provision.

On the particular facts presented, the imported merchandise, the bronze pinnacles which constitute the crown of the Madonna, Queen of the Universe statue, are appurtenances or adjuncts of a shrine, an article specifically enumerated in tariff item 850.70.

In view of the foregoing, it is the determination of the court that the imported bronze pinnacles are entitled to duty-free entry under item 850.70 of the Tariff Schedules of the United States.

Judgment will issue accordingly.

Appendix "A"

APPENDIX "B"

APPENDIX "C"